[No. 5958–8–III.   Division Three.   July 23, 1985.]

GENO ORSI, ET AL, *Plaintiffs,* CONSUMERS INSURANCE COMPANY, *Appellant,* v. AETNA INSURANCE COMPANY, ET AL, *Respondents.*

234

Steven Klug and Miller & Daar, for appellant.

Curtis Shoemaker and Paine, Hamblen, Coffin & Brooke, for respondent Aetna Insurance.

Ronald D. Kappelman and Malott, Southwell & O'Rourke, P.S., for respondent United Pacific Insurance.

McINTURFF, J.—This case arises out of a fire that destroyed Gino's World Food Mart, Inc., located in Spokane. Consumers Insurance Company brought a claim seeking contribution from United Pacific Insurance Company and Aetna Insurance Company. The court determined United did not insure the building and Aetna's policy provided only limited coverage. On appeal, Consumers claims the court erred in (1) admitting parol evidence; (2) determining United validly canceled coverage; and (3) concluding Aetna extended only "excess" coverage. We affirm.

On April 2, 1978, Gino's World Food Mart was destroyed by fire. Three insurance companies, Consumers, Aetna and United, had issued policies with various amounts of coverage for the building and/or its contents. Their respective liabilities are at issue.

In April 1977, Thomas and Debra Jacobson, d/b/a Gino's Food Mart, Inc., began operating the store, leasing the premises from Geno and Olga Orsi. The lease authorized

Mr. Jacobson to procure, modify and cancel building insurance policies. When the Jacobsons entered into the lease, two policies covered the store: an Aetna policy insured the building contents through March 15, 1978; a Consumers policy insured only the building for $200,000 in "actual cash value" protection through May 1, 1978.

## THE UNITED POLICY

In an effort to consolidate the Aetna and Consumers policies into one, on March 7, 1978, Mr. Jacobson contacted David Johnson, an insurance agent for both Consumers and United. They discussed a policy which would have covered equipment, inventory, business interference and the building itself for $175,000. On March 15, Mr. Johnson issued a binder on behalf of United to cover inventory, equipment, business interruption and $175,000 coverage on the building. He delivered the original and one copy of United's binder to the Food Mart manager the following day. Within a few days United informed Mr. Johnson this policy extended more building protection than United would assume. Consequently, the underwriter deleted building coverage from United's copy of the binder agreement. Mr. Johnson informed Mr. Jacobson United could not insure the building, but would provide the remaining coverages. Mr. Jacobson responded he would procure building coverage elsewhere. United never issued a formal cancellation notice.

## THE AETNA POLICY

During the time Mr. Jacobson discussed coverage with United, he also considered coverage with Aetna. On March 9, he met with Norm Wilson, an Aetna agent, and reviewed a policy similar to that negotiated with United. Aetna's policy would have provided $200,000, rather than $175,000, in building coverage. Although the parties did not discuss the premium, Mr. Wilson ordered the Aetna policy pursuant to these discussions. Mr. Wilson received the policy March 24, countersigned it as Aetna's agent, and attempted to deliver the policy. He also issued a certificate of insur-

ance to Mr. Orsi, the owner of the building. The actual policy was never delivered to Mr. Jacobson.

After the fire, United paid the Orsis and Jacobsons $224,000 for the loss of the building contents. Consumers paid them $200,000 for the loss of the building. The Orsis and Jacobsons then brought suit against United and Aetna to recover the additional building losses. Consumers intervened as a plaintiff.

After a bench trial, the court determined: (1) Mr. Jacobson acted with full authority as Mr. Orsi's agent with respect to premises insurance; (2) United properly canceled that portion of the policy relating to building coverage, thereby eliminating its liability for the building loss; (3) a valid insurance policy existed between Aetna, the Orsis and the Jacobsons when the building was destroyed; and (4) this policy provided excess fire insurance coverage for building losses exceeding the $200,000 coverage Consumers provided.

█ Consumers first contends the court erred by admitting parol evidence of Mr. Jacobson's intent to obtain concurrent or excess fire insurance coverage. The parol evidence rule provides that all prior negotiations, conversations and parol agreements merge into a final, unambiguous, integrated writing, and extrinsic evidence is inadmissible to add to, subtract from, vary or contradict the terms of the instrument. *Heath Northwest, Inc. v. Peterson,* 67 Wn.2d 582, 584, 408 P.2d 896 (1965); *Continental Ins. Co. v. Paccar, Inc.,* 26 Wn. App. 850, 857–58, 614 P.2d 675 (1980), *rev'd on other grounds,* 96 Wn.2d 160, 634 P.2d 291 (1981). But, the parol evidence rule does not prevent extrinsic evidence of an agreement made subsequent to the execution of the written agreement even if it adds to, changes, modifies, or qualifies the terms of the written agreement. *Simonson v. "U" Dist. Office Bldg. Corp.,* 70 Wn.2d 35, 40–41, 422 P.2d 1 (1966); *Paccar,* at 858. The court may also admit parol evidence "to prove the real character of the transaction . . ." *Ransom v. Wickstrom & Co.,* 84 Wash. 419, 427, 146 P. 1041 (1915); *Inter-*

*national Harvester Co. v. Bank of Cal., N.A.,* 29 Wn. App. 905, 911, 632 P.2d 522 (1981).

With respect to the United policy, United claimed the parties modified the policy after they had entered into it. On March 15, Mr. Johnson bound United to coverage for the building, inventory, equipment and business interruption. Upon being notified United would not cover the building for the amount stated in the binder, Mr. Johnson called Mr. Jacobson and they agreed the building would not be covered by the United policy. But they did agree United would continue to insure the inventory, equipment and business interruption. Since the parol evidence concerned subsequent modifications by the parties, the court properly admitted the evidence. For the court to determine whether the parties wanted concurrent or substitute coverage in relation to the Aetna policy, it also had to consider parol evidence. Thus, in both circumstances, the evidence was properly admitted.

■ Second, Consumers alleges the court erred in concluding United validly canceled the building coverage portion of its written binder. Consumers claims United's cancellation was ineffective because (1) it was not in correct statutory form; (2) Mr. Jacobson lacked authority to accept cancellation; and (3) the parties did not mutually agree to the cancellation. With respect to the form of the cancellation, former RCW 48.18.290 required that any cancellation by the insurer may be effected only by written, 20–day notice delivered to those parties having an interest in any loss of the insured property. But the agreement between United and Mr. Jacobson to restrict coverage to all but the building itself is more a contract modification than cancellation. Where an existing contract is changed, with the contract thereafter remaining in force, statutory provisions relative to cancellations of insurance are inapplicable.[1] 17

---

[1] Consumers claims the change in the policy constituted cancellation, citing *Transit Lumber Co. v. International Indem. Co.,* 153 Wash. 594, 280 P. 13 (1929). There, Transit Lumber had contracted for $1,200 in fire insurance coverage for a

G. Couch, *Insurance* § 67:32 (1983); *see also Isadore v. Washington Fire & Marine Ins. Co.,* 75 So. 2d 247, 249 (La. Ct. App. 1954) (initial fire policy insured two dwellings; later modification deleted coverage for one of the dwellings).

■ Moreover, Mr. Jacobson had the authority, acting as Mr. Orsi's agent, to consent to the oral cancellation of the insurance policy. One securing insurance for another becomes an agent for that person, *Hardcastle v. Greenwood Sav. & Loan Ass'n,* 9 Wn. App. 884, 887, 516 P.2d 228 (1973), and has only such authority as is conferred upon him by his principal, the insured. An agent authorized to procure insurance, without additional authorization, usually lacks authority to cancel the policy. *Codd v. New York Underwriters Ins. Co.,* 19 Wn.2d 671, 678, 144 P.2d 234 (1943); 3 G. Couch § 25:16. But one authorized to procure insurance *and* to exercise his own discretion as to companies, form and amount of policies has authority to cancel a policy. *Apparel Mfrs.' Supply Co. v. National Auto. & Cas. Ins. Co.,* 189 Cal. App. 2d 443, 11 Cal. Rptr. 380 (1961); *see also* 3 G. Couch § 25:17; Annot., *Substitution by Common Agent of Two or More Insurance Companies of Policy of One Company for Policy of Another,* 83 A.L.R. 298, 311 (1933). The question of an agency relationship is one of fact unless no facts are in dispute and the facts are susceptible of only one interpretation in which case the relationship becomes a question of law. *Graves v. P.J. Taggares Co.,* 94 Wn.2d 298, 302–03, 616 P.2d 1223 (1980); *Blodgett v. Olympic Sav. & Loan Ass'n,* 32 Wn. App. 116, 128, 646 P.2d 139 (1982).

---

truck. Later, in consideration for a return of $5, Transit agreed to reduce the coverage to $600. The court determined the attempt to reduce coverage constituted "policy cancellation" and a rewriting of a new contract. *Transit Lumber,* at 597. That case is distinguishable in that the *Transit Lumber* policy dealt only with one insurable interest. Reduction of the coverage eliminated all of the initial contract. Here, however, several different kinds of coverage were involved and the parties agreed to delete one of them. Although the existing contract was changed, it continued to remain in force.

Here, the court determined Mr. Orsi clothed Mr. Jacobson with the authority to act for him in all insurance matters. The court apparently based its decision upon: (1) Mr. Orsi left Mr. Jacobson in exclusive control of insurance coverage; (2) Mr. Orsi did not concern himself with the amount or type of coverage on the building and its contents; (3) Mr. Jacobson negotiated insurance coverage; and (4) Mr. Orsi never insisted on enforcement of lease provisions requiring specific replacement value insurance coverage (as opposed to "actual cash value" coverage). The record also indicates Mr. Orsi allowed Mr. Jacobson to change insurance companies if he deemed it appropriate. This evidence substantiates his authority to enter into and cancel insurance contracts.

The final determination concerning the validity of United's cancellation is whether the oral cancellation was obtained through mutual consent of the parties.

[A] policy may be orally canceled by mutual consent of the parties. But to effect the cancellation of a policy, there must be an actual agreement or understanding to the effect that the policy is then and there canceled.

*Blomquist v. Grays Harbor Med. Serv. Corp.*, 48 Wn.2d 718, 721, 296 P.2d 319 (1956). The same rule applies to modifications. *Grand Lodge of Scandinavian Fraternity of Am., Dist. 7 v. United States Fid. & Guar. Co.*, 2 Wn.2d 561, 572, 98 P.2d 971 (1940); 17 G. Couch § 65:17; 13A J. Appleman, *Insurance* § 7602 (1976 & Supp. 1984). Whether the parties actually agreed to cancel that portion of the insurance contract is a question of fact. *Codd v. New York Underwriters Ins. Co., supra* at 677.

Here, the court determined the parties canceled the building coverage by mutual consent based upon the telephone conversation in which, after being told United could not insure the building, Mr. Jacobson told Mr. Johnson "not to worry about it, that he [Jacobson] would take care of it." This evidence indicates Mr. Jacobson knew of the change and consented to it. Substantial evidence supports the ruling that United validly canceled its coverage.

Third, Consumers claims the court erred in finding Aetna's coverage was "excess". It is undisputed Aetna agreed to provide $200,000 coverage on the same building insured by Consumers. Where such concurrent coverage exists, there are restrictions called "other insurance" clauses providing rules for how the losses will be allocated to each insurer. The central issue between Consumers and Aetna concerns the proper interpretation and application of the two "other insurance" clauses in their respective policies. At the time of the fire, the building was covered by the Consumers policy. This policy had a $200,000 limit and contained a pro rata[2] clause which provided:

> Pro Rata Liability. This company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved, whether collectible or not.

This pro rata clause is found in the standard form fire insurance contract approved by the Washington State Insurance Commissioner. RCW 48.18.120; WAC 284–20–010.

█ The building was also covered under an Aetna policy providing $200,000 coverage and containing this excess[3] clause:

> This policy shall apply only as excess insurance over any other valid and collectible insurance which would apply in the absence of this policy unless this policy is specifically endorsed to provide for contributing insurance.

Aetna attached this provision to its policy as an endorse-

---

[2]Basically, pro rata coverage provides that the insurers will pay equally, amongst the insurers of the loss, up to the maximum limits of the smaller policy. Any remaining portion of the loss shall be paid by the larger policy until it is exhausted or full compensation of loss achieved. *Mission Ins. Co. v. Allendale Mut. Ins. Co.*, 95 Wn.2d 464, 467, 626 P.2d 505 (1981).

[3]The typical excess clause provides that the insurers' liability "shall be only the amount by which the loss exceeds the coverage of all other available insurance, up to the limits of the excess policy." Annual Survey of Washington Law, *Effect of Conflicting "Other Insurance" Clauses*, 41 Wash. L. Rev. 564, 565 n.8 (1966).

ment limiting liability. Ordinarily, where two contracts provide concurrent coverage and a conflict exists between the "other insurance" clauses, the policy with the pro rata provision applies first, up to its stated limit. Resort is made to the policy with the excess clause only after the other insurance has been exhausted. *General Ins. Co. of Am. v. State Farm Ins. Co.*, 75 Wn.2d 200, 202, 449 P.2d 391 (1969); *General Ins. Co. of Am. v. Rocky Mt. Fire & Cas. Co.*, 70 Wn.2d 384, 387, 423 P.2d 537 (1967); *see also* Annot., *Resolution of Conflicts in Non–Automobile Liability Insurance Policies, Between Excess or Pro–Rata "Other Insurance" Clauses*, 12 A.L.R.4th 993, 998–99 (1982 & Supp. 1984). Consumers claims this rule is inapplicable for two reasons: (1) Aetna's excess clause contradicts the pro rata coverage implied in its oral binder; and (2) even if Aetna's excess clause were properly adopted, that clause contradicts the standard statutory policy and should be invalid under public policy. We disagree.

■ A binder is a temporary insurance contract providing interim coverage from the date of application until the issuance of the formal policy. RCW 48.18.230; *Carew, Shaw & Bernasconi, Inc. v. General Cas. Co. of Am.*, 189 Wash. 329, 337, 65 P.2d 689 (1937); 12A J. Appleman § 7227. Prior to the issuance of the formal policy, the terms and provisions controlling the interpretation of the coverage afforded by a binder are those contained in the standard fire insurance policy form. *Mayo v. American Fire & Cas. Co.*, 282 N.C. 346, 192 S.E.2d 828 (1972); *British Am. Ins. Co. v. Wilson*, 77 Conn. 559, 60 A. 293 (1905); 2 G. Couch § 14:16–:17; 12A J. Appleman § 7232. But binders are not intended to include all contract terms and one must always look to the formal policy subsequently issued for a complete statement of the agreement. Hence, the temporary contract is subject to all the conditions of the contemplated policy.

■ There are two reasons why the Aetna policy extended excess coverage. First, the standard New York fire insurance form, adopted in Washington, provides pro rata coverage but also allows the insurer to limit "by endorse-

ment attached". 1943 New York Standard Fire Insurance Policy, lines 25–27. The form also provides:

Added provisions. The extent of the application of insurance under this policy and of the contribution to be made by this Company in case of loss, and *any* other provision or *agreement* not inconsistent with the provisions of this policy, *may be provided for in writing added hereto, but no provision may be waived except such as by the terms of this policy is subject to change.*

(Italics ours.) Thus, the standard form does not preclude the inclusion of other insurance clauses and policies written in this state. Rather, it permits a clause to be included by endorsement, which presumably assures a policyholder will be clearly and specifically placed on notice that the purchase of the additional insurance changes the extent of existing coverage. *See Allstate Ins. Co. v. Old Republic Ins. Co.,* 49 N.C. App. 32, 270 S.E.2d 510, 513 (1980).

Here, Mr. Jacobson and Mr. Wilson held discussions concerning insurance coverage on the contents and the building. Pursuant to those discussions, Mr. Wilson issued an oral binder and ordered coverage from Aetna. Aetna's policy had attached a page entitled "General Provisions" which included the excess provision. Thus, by virtue of the standard New York policy which allows for added provisions limiting liability, Aetna properly limited its liability to excess coverage by attaching the excess endorsement.

Moreover, this endorsement is reasonable based upon the administrative approval of Aetna's excess provision. The insurance commissioner is authorized to promulgate rules and regulations to effect reasonable uniformity in basic fire insurance contracts. Supplemental riders or endorsements must assure "a reasonable concurrency of contract" where two or more insurers insure the same subjects and risks. RCW 48.18.120.

The meaning of "reasonable concurrency" is clarified by RCW 48.18.130, which reads, in pertinent part:

The commissioner may waive the required use of a particular standard provision in a particular insurance con-

tract form if

    (a) he finds such provision unnecessary for the protection of the insured, and inconsistent with the purposes of the contract, and

    (b) the contract is otherwise approved by him.

Indeed, WAC 284–20–010(3), specifying state adoption of the New York standard fire insurance form, allows alternative forms to be adopted provided the different provisions are "not less favorable to the insured than the 'standard fire policy". WAC 284–20–010(3)(d).

Here, Aetna provided reasonable concurrency because the excess clause is not "less favorable" to an insured. It can limit coverage only when another "valid and collectible" insurance exists; the Orsis' coverage is unaffected by the method in which the loss is allocated between Consumers and Aetna. Moreover, the commissioner approved Aetna's excess language and therefore the endorsement was an approved alternative to the New York standard fire insurance policy. Since the oral binder must conform to the contemplated policy, and Aetna's contemplated policy afforded excess coverage, we conclude Aetna's policy provided excess coverage only.[4]

Fourth, Consumers claims the court erred in refusing to conclude its policy was terminated by operation of law March 15, 1978, citing *Bache v. Great Lakes Ins. Co.*, 151 Wash. 494, 276 P. 549 (1929).

    The critical language in *Bache* reads, at page 499:[5]

---

[4]Consumers also maintains the insurance commissioner improperly approved this excess provision because he did not promulgate a rule approving the alternate policy language. But the commissioner's action approving Aetna's policy language is not a "rule" as defined by RCW 34.04.010(2) as it is not an agency order, directive, or regulation of general applicability. The commissioner approved Aetna's use of the language, but no other insurance company could use it without the commissioner's approval. In addition, the commissioner did not overstep his authority by approving this specific language since the approval did not establish, alter or revoke the mandatory standards of WAC 284–20–010 or RCW 48.18.120, but merely waived compliance with them by Aetna. RCW 34.04.010(2)(e).

[5]Most modern decisions reflect a view by the courts that an insured may not cancel an existing policy of property insurance merely by obtaining a new policy

> [T]he procuring of new insurance by an owner, or by his agent authorized so to do, for a term commencing before the expiration of the term of existing insurance, with intent to have the new insurance take the place of the existing insurance . . . constitutes in law an effective, voluntary cancellation of the existing insurance.

Whether the parties intended to have the new insurance take the place of the existing insurance is a question for the trier of fact. *See Burton v. Douglas Cy.,* 65 Wn.2d 619, 621–22, 399 P.2d 68 (1965); *Foster v. Nehls,* 15 Wn. App. 749, 750–51, 551 P.2d 768 (1976).

Here, the court concluded as a factual matter Mr. Jacobson did not intend to have the new Aetna and United policies take the place of the existing Consumers policy. The court noted:

> [A]lthough there was an insurance coverage provision contained in the lease which indicated the insurance should be sufficient to replace the building in the event of a loss, at no time did Mr. Jacobson ever intend to have more than $200,000.00 on the building at the time of the fire, and building replacement coverage was not sought by Mr. Jacobson, acting for himself and/or as agent for Mr. Orsi. Mr. Jacobson never indicated that he intended during the course of the negotiations set forth hereafter to replace the Consumer's policy. It appears that Mr. Jacobson was considering other options as to insurance coverage, and at the time of the fire in question he had not yet made up his mind as to the specific coverage that was to be in force and effect. It was Mr. Jacobson's intent to have the Consumer's policy in effect at the time of the fire.

Thus, the court based its decision upon the fact (1) Mr. Jacobson never expressed an intent to replace the Consumers policy; and, (2) at the time of the fire Mr. Jacobson was considering several insurance coverage options and had not chosen one. Although the record is contradictory on

---

absent notice to the existing carrier, or some other indicia of the existing carrier's knowledge of the insured's intent to cancel and acquiescence thereto. *See* Annot., *Obtaining New Property Insurance as Cancellation of Existing Insurance,* 14 A.L.R.4th 781, 783 (1982 & Supp. 1984).

whether Mr. Jacobson intended to have the new policy replace the existing policy, the facts stated above constitute substantial evidence in support of the court's finding that Mr. Jacobson did not intend new coverage for the Consumers policy.

Lastly, we consider whether the court improperly ruled upon the "bad faith" claims. Consumers' complaint alleged United and Aetna denied coverage in bad faith, which violates RCW 48.01.030,[6] and constitutes an unfair business practice under the Consumer Protection Act (CPA).[7] Consumers later moved for and was granted, a voluntary dismissal of the "Consumer Protection Act claims", without prejudice, pursuant to CR 41.[8] There was no mention of

---

[6]RCW 48.01.030 provides:

"The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, and their representatives rests the duty of preserving inviolate the integrity of insurance."

[7]The CPA prohibits unfair business practices affecting the public interest. Since bad faith denials of insurance coverage affect the "public interest", one may bring a CPA claim and, if the prevailing party, receive attorney fees and treble damages. RCW 19.86.090.

[8]CR 41 specifies that an action will be dismissed upon plaintiff's motion unless defendant has asserted a counterclaim. CR 41(a)(3). There is some question whether CR 41 is the appropriate rule under which one will drop a *claim*. Both rules 41(a)(1) and 41(a)(2) apply by their terms to dismissal of an *action*. The reference to an *action* in rule 41(a) contrasts with rule 41(b), which provides that "a defendant may move for dismissal of an action *or of any claim* against him." (Italics ours.) Thus, rule 41(b) is broader and more comprehensive than the parallel language in CR 41(a). 5 J. Moore, *Federal Practice* § 41.06 (1984 & Supp. 1985). Although the judicial council advisory committee notes do not discuss the question, it would seem the drafters of rule 41 would have included similar language in rule 41(a) had they intended to have that rule cover dismissal by the plaintiff of less than all of the claims against any defendant.

The federal rules and cases construing them make a clear distinction between a "claim" and an "action". Thus, when CR 41(a) refers to dismissal of an "action" there is no reason to suppose the term is intended to include the separate claims which may make up the action. When "dismissal of a claim" is intended, as in rule 41(b), that concept is spelled out clearly. Thus, an amendment under CR 15(a) is technically the proper procedure, rather than voluntary dismissal under CR 41(a). *Management Investors v. United Mine Workers*, 610 F.2d 384, 393–94 (6th Cir.

"bad faith" claims in that motion. Before trial, the court considered Consumers' motion for partial summary judgment and noted:

> Have either United Pacific or Aetna denied coverage in bad faith in violation of RCW 48.01.030 which would constitute unfair business practice under RCW 19.86-.020? Again, it is the recollection of the court that this matter has been settled, but in order to properly embody the court's findings in an order, it is now the finding of the court that neither Aetna nor United Pacific acted in violation of the respective statutes cited and that there is no action of either company which would *constitute unfair business practice as alleged.*

Consumers claims the court erred when considering the above motion, when it ruled on the bad faith claims because those claims were dismissed with the CPA claims. We begin with the basic premise that every motion must specify the grounds and relief sought "with particularity", CR 7(b)(1); 5 C. Wright & A. Miller, *Federal Practice* § 1192 (1969 & Supp. 1985), and courts may not consider grounds not stated in the motion. 56 Am. Jur. 2d *Motions* § 11 (1971 & Supp. 1984). Consequently, Consumers' failure to request dismissal of the bad faith claims, in addition to the CPA claims, left those issues remaining before the court for its determination. The court found, as a factual matter, no evidence to support Consumers' allegation relating to the "bad faith" claims. We conclude the finding was within the ambit of the evidence, and therefore choose not to disturb it.[9]

The judgment of the Superior Court is affirmed.

GREEN, C.J., and THOMPSON, J., concur.

---

1979); *Smith, Kline & French Labs v. A.H. Robins Co.,* 61 F.R.D. 24, 28–29 (E.D. Pa. 1973).

[9] On appeal United seeks attorney fees on the basis that the appeal is frivolous. But because reasonable minds could disagree as to the validity of the agreement between United and the Orsis, we refuse to grant attorney fees. *See Streater v. White,* 26 Wn. App. 430, 613 P.2d 187 (1980).