**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIBER ONE INDEMNITY COMPANY,
a foreign corporation,
            *Plaintiff-Appellee,*

v.

WADE COOK FINANCIAL
CORPORATION, a foreign
corporation,

            *Defendant,*

            and

DIANA K. CAREY,
            *Trustee-Appellant.*

No. 04-35181

D.C. No.
CV-01-01128-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, Chief District Judge, Presiding

Argued and Submitted
July 27, 2006—Seattle, Washington

Filed June 22, 2007

Before: J. Clifford Wallace, Kim McLane Wardlaw and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher;
Partial Concurrence and Partial Dissent by Judge Wardlaw

7531

**COUNSEL**

H. Troy Romero and Michael E. Wiggins (argued), Romero Montague P.S., Bellevue, Washington, for appellant Wade Cook Financial Corporation.

William A. Pelandini (argued), Melissa O'Loughlin White and Thomas J. Braun, Cozen O'Connor, Seattle, Washington, for appellee Caliber One Indemnity Company.

## OPINION

FISHER, Circuit Judge:

This case arises from a commercial property insurance policy Plaintiff-Appellee Caliber One Indemnity Company ("Caliber One") issued to the Defendant Wade Cook Financial Corporation ("Cook"). Cook — through its trustee Diana K. Carey — appeals the district court's summary judgment under Washington law that the insurance contract between Cook and Caliber One limited earthquake coverage to $500,000, subject to a deductible calculated as a percentage of the total insured value of the property affected by an earthquake rather than of the claimed earthquake loss. Cook also appeals the district court's refusal to consider affidavits submitted in connection with its motion for reconsideration. We affirm in part and reverse in part.

### BACKGROUND

In 1998, Cook purchased a comprehensive commercial property insurance policy from Caliber One that, among its various terms and conditions, provided $5 million in earthquake coverage for various buildings Cook owned. In 1999, Cook — through its insurance broker, Crump Insurance Services, Inc. ("Crump") — told Caliber One that Cook wanted to renew the policy "under exactly the same terms" as the initial 1998 policy. Contrary to Cook's asserted intent and apparently unbeknownst to it, the 1999-2000 policy Caliber One issued and Cook accepted contained only a $500,000 sublimit for earthquake coverage. Caliber One acknowledges that the reduction in earthquake coverage from $5 million to $500,000

was simply the result of a "clerical error in the preparation of that policy."

In 2000, Cook sought to renew the policy once again, "on the same terms and conditions" as the 1999-2000 policy. Consequently, the mistaken $500,000 earthquake sublimit carried through to the renewal policy. Caliber One gave Cook (through Crump) a quotation confirmation including the $500,000 earthquake sublimit, and Cook "accept[ed] the quote" and expressed its "wish[ ] to have the agreement bound." The final insurance policy in effect from December 2000 to December 2001 therefore had a stated earthquake coverage limit of $500,000. Also relevant to this appeal, the insurance policy provided that in the event of a claim, Cook would be responsible for a "5.00% deductible Earthquake per occurrence, minimum $50,000."

On February 28, 2001, Cook's corporate headquarters in Tukwila, Washington, suffered significant damage as a result of a large earthquake in the Puget Sound area. Losses, according to Cook, were in excess of $8 million. After Cook submitted a claim, Caliber One discovered the $500,000 sublimit and traced it to the much earlier clerical error. It notified Cook of the limit and stated its intent to seek declaratory judgment that its liability would be only that lesser amount. Moreover, Caliber One notified Cook that its claim would be subject to a deductible of $695,100, calculated as 5% of the total insured value ("TIV") of the damaged corporate headquarters building ($13,902,000). Cook contended that the deductible was only about $400,000, calculated as 5% of the loss suffered rather than 5% of the TIV.

Both parties sought summary judgment in the federal district court as to the amount of coverage and the meaning of "deductible." The district court determined that the $500,000 sublimit was unambiguous and declined to consider extrinsic evidence to contradict that amount. The court also rejected Cook's claim of mutual mistake, and refused to reform the

contract on the ground that Crump, Cook's insurance broker, knew about the $500,000 sublimit and its knowledge was imputed to Cook. As to the definition of "deductible," the district court held that the term was ambiguous, rejecting Cook's argument that the term plainly referred to the amount of loss. Relying on evidence submitted by Caliber One to elucidate the meaning of deductible, including documents Crump drafted referring to the deductible as 5% of TIV, the district court granted summary judgment in favor of Caliber One.

Cook moved for reconsideration and offered two declarations from Crump employees. Cook argued that these declarations supported its mutual mistake claim and directly contradicted the district court's finding that Crump knew of the mistake in the earthquake sublimit. The district court refused to reconsider its earlier summary judgment or the new declarations, concluding that Cook could not satisfy the strict test for admission of new evidence.

## STANDARD OF REVIEW

We review de novo the district court's rulings on cross-motions for summary judgment. *See Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140, 1143 (9th Cir. 2003). The district court's ruling on a motion for reconsideration is reviewed for abuse of discretion. *See Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1100 (9th Cir. 2004).

## DISCUSSION

### 1. Earthquake Sublimit

**[1]** The district court erred in holding the mutual mistake doctrine inapplicable, precluding Cook from obtaining reformation of the contract. Under Washington law, "a mutual mistake occurs when the parties, although sharing an identical intent when they formed a written document, did not express that intent in the document." *Seattle Prof'l Eng'g Employees*

*Ass'n v. Boeing Co.*, 991 P.2d 1126, 1130 (Wash. 2000) (internal quotation marks and citation omitted). Cook claims that a mutual mistake occurred when the contract for the 2000-01 term failed to express the parties' identical intent that the earthquake sublimit provide $5 million in coverage.

**[2]** Negligence in failing to observe that a writing does not express what has been assented to "is not a bar to reformation of a contract when the reformation claim is based upon mutual . . . mistake." *Wash. Mut. Sav. Bank v. Hedreen*, 886 P.2d 1121, 1125 (Wash. 1994). Here, Cook was negligent in failing to confirm that the terms of the 1999-2000 contract were the same as those in the 1998-99 contract and were in turn correctly restated in the 2000-01 contract. Caliber One was similarly negligent in failing to catch the mistake in the 1999-2000 contract, which Cook claims Caliber One unwittingly repeated in the 2000-01 policy.

**[3]** The most reasonable inference to be drawn is that both Caliber One and Cook intended the terms of the original 1998-99 contract to carry over into the contracts governing policy years 1999-2000 and 2000-01. Because Caliber One has provided no contemporaneous evidence to refute the reasonable inference that both parties shared an identical intent that the 2000-01 contract provide $5 million in earthquake coverage, and because the parties' mutual mistake in providing only $500,000 in coverage does "relate to a basic assumption on which both parties relied when making the contract," *Denaxas v. Sandstone Court of Bellevue*, 63 P.3d 125, 131 (Wash. 2003), reformation is warranted. *See Denny's Rest., Inc. v. Sec. Union Title Ins. Co.*, 859 P.2d 619, 629 (Wash. Ct. App. 1993).

Caliber One argues that Cook had "constructive knowledge of the circumstances giving rise to the alleged mistake," *Denaxas*, 63 P.3d at 131, and is not entitled to reformation because Cook's belief was actually in accord with the stated sublimit in the 2000-01 contract and thus not mistaken. How-

ever, there is no evidence that Crump actually knew that the sublimit had been reduced from the original 1998-99 amount — although had Crump compared the original policy with the second-generation 2000-01 policy, the discrepancy would have surfaced. Moreover, although Crump acted as Cook's agent in securing insurance, *see Orsi v. Aetna Insurance Co.*, 703 P.2d 1053, 1057 (Wash. Ct. App. 1985), Crump's role in renewing Cook's insurance contract with Caliber One insofar as the earthquake sublimit is concerned was ministerial. Unlike the project architect in *Denaxas*, who had actual knowledge of the true square footage and who had the authority to create a project that would fit the available land, there is no evidence that Crump had the unilateral discretion to accept a change in the earthquake sublimit coverage. Crump was merely obeying Cook's instructions to renew on the terms Caliber One had previously provided, which both Cook and Crump assumed were the same as those set forth in the 1998 policy. *See Roderick Timber Co. v. Willapa Harbor Cedar Prods., Inc.*, 627 P.2d 1352, 1355 (Wash. Ct. App. 1981), *cited in Denaxas*, 63 P.3d at 130.

**[4]** Importantly, Caliber One has admitted that both parties intended the original and first renewal insurance contracts to provide $5 million in earthquake coverage and that the change to $500,000 was simply a clerical error. Accordingly, the parties here are unlike the seller and purchaser in *Denaxas*, whose respective intentions differed as to the formulation of a price offer based on square footage. *Denaxas*, 63 P.3d at 132-33. The parties' contractual intentions were identical, and even though Cook or Crump may bear some responsibility for not discovering Caliber One's error, that does not preclude reformation for mutual mistake. *See Hedreen*, 886 P.2d at 1126 (stating that "mere carelessness, however, is not necessarily a defense to an action for reformation" and that "[i]f negligence were a defense to a reformation claim, then reformation would almost never be available as a remedy because . . . negligence generally results from mistake") (internal quotation marks and alterations omitted).

**[5]** Because the district court erred in holding the mutual mistake doctrine inapplicable on the basis of Crump's supposed knowledge of the stated $500,000 sublimit, we reverse the court's summary judgment to Caliber One in this respect. Upon remand the district court should reform the 2000-01 contract to reflect the parties' intent that the earthquake sublimit provide $5 million in coverage.

### 2. *Deductible Amount*

**[6]** Cook argues that the term "deductible" is itself unambiguous and is necessarily tied to the amount of loss claimed. Caliber One counters that the term is ambiguous in context here, and that the parties demonstrably intended the amount of the deductible to be tied to the TIV of the building giving rise to the loss. Under Washington law, "[a] policy provision is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable." *Morgan v. Prudential Ins. Co. of Am.*, 545 P.2d 1193, 1195 (Wash. 1976).

**[7]** Washington law cautions against a court "creat[ing] ambiguity where none exists," *Ross v. Hall & Co.*, 870 P.2d 1007, 1010 (Wash. Ct. App. 1994), and if a term is undefined, "[it] must be given [its] plain, ordinary, and popular meaning," *Tyrrell v. Farmers Ins. Co. of Wash.*, 994 P.2d 833, 836 (Wash. 2000) (quotation omitted). However, Washington law provides that "if a contract is ambiguous on its face . . . the court [will] look to evidence of the parties' intent as shown by the contract as a whole, its subject matter and objective, the circumstances of its making, the subsequent conduct of the parties, and the reasonableness of their interpretations." *Berg v. Hudesman*, 801 P.2d 222, 228 (Wash. 1990). Moreover, "[i]f the clause is ambiguous . . . extrinsic evidence of intent of the parties may be relied upon to resolve the ambiguity." *Panorama Village Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co.*, 26 P.3d 910, 913-14 (Wash. 2001) (citation omitted).

CALIBER ONE INDEMNITY V. CAREY    7541

**[8]** The district court did not err in finding ambiguous the 2000-01 policy definition of deductible — "5.00% deductible Earthquake per occurrence, minimum $50,000" — because nothing within that definition or the contract considered as a whole explains what figure serves as the basis for the 5% calculation. Nor does the clause become unambiguous if given its "plain, ordinary, and popular meaning," *Tyrrell*, 994 P.2d at 836, because the text's plain, ordinary and popular meaning is not evident.

**[9]** Here, the policy does not explain whether "deductible . . . per occurrence" refers to the loss claimed or the total insured value of the property suffering a covered loss.[1] The dissent's conclusion, based on dictionary definitions, that the word "deductible" unambiguously refers to a percentage of loss is not persuasive. *See* Diss. at 7544. Dictionaries do not "uniformly" define the word "deductible" in relation to the amount of loss suffered. *See Boeing Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d 507, 511 (Wash. 1990). The American Heritage College Dictionary 362 (3d ed. 2000), for example, defines "deductible" as "[a] clause in an insurance policy that exempts the insurer from paying a specified amount in the event of a claim." Here, the "specified amount" is defined in terms of percentage, but we cannot conclusively tell from the four corners of the contract what the percentage is *in relation to*. Even assuming as true, as an empirical matter, that most deductible provisions are defined in relation to the amount of loss claimed — a proposition not supported by any evidence before us — we still disagree that the word "deductible" is so consistently defined in relation to amount of loss that the term is unambiguous on its face.

**[10]** Nor does the policy definition's reference to a "mini-

---

[1]The examples provided in Caliber One's Commercial Property Building Coverage Form do not resolve this ambiguity, because, although they show how a deductible functions when a claim of loss is processed, they do not explain how the deductible itself is calculated.

mum $50,000" deductible obviate the ambiguity, as Cook argues. Cook's theory is that there would be no need to specify an alternative minimum if the percentage basis referred to TIV — because the TIV of covered property would presumably be fixed from the start, 5% of which would be thus specifiable. Although this argument has some force, the policy at issue covers multiple buildings, any one or a combination of which could potentially be damaged by an earthquake or appreciate or depreciate in value during the course of the policy's effectiveness. Thus, the alternative minimum deductible is not superfluous if the percentage basis is understood as referring to TIV.

**[11]** Given the ambiguity in the deductible definition, the district court did not err in admitting "extrinsic evidence of [the] intent of the parties . . . to resolve the ambiguity." *Panorama Village*, 26 P.3d at 913-14 (internal citation omitted). Nor did the district court err in holding that the extrinsic evidence reveals the parties' intent and resolves the ambiguity in Caliber One's favor. Cook offered no extrinsic evidence to prove that it intended the deductible to correlate with the amount of loss claimed. By contrast, Caliber One offered into evidence documents Crump prepared — a certificate of liability insurance and a property insurance proposal — that expressly tied the deductible to TIV. Summary judgment is appropriate where, as here, the undisputed evidence supports only one reasonable inference. *See Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985) (holding that "where the palpable facts are substantially undisputed, such issues can become questions of law which may be properly decided by summary judgment"). Accordingly, we affirm the district court's conclusion that the contract's deductible refers to the TIV of the property affected by an earthquake.

*3. Affidavits*

**[12]** We also affirm the district court's refusal to consider the affidavits Cook submitted with its motion for reconsidera-

tion. Cook has not argued that the facts sworn to in them were "newly discovered or unknown to it" prior to the filing of its motion for reconsideration, nor has Cook shown that "it could not with reasonable diligence have discovered and produced" the affidavits earlier. *See Frederick S. Wyle P.C. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir. 1985).

The parties shall bear their own costs.

**AFFIRMED in part, REVERSED in part.**

---

WARDLAW, Circuit Judge, concurring in part and dissenting in part:

I agree that the mutual mistake doctrine is applicable, the contract should be reformed, and that the district court properly excluded Cook's affidavits. However, I dissent because both the district court and the majority have erred by using extrinsic evidence to create ambiguity where none exists. Nothing in the policy language supports the majority's view that "5.00% deductible" meant a percentage of the total insured value ("TIV") of properties affected by the earthquake, or that the TIV would be adjusted during the policy term for appreciation or depreciation of the covered properties.

This is a diversity action, which requires us to apply Washington State's law. When interpreting insurance contracts, "[t]he pertinent rules are simple enough. If the policy language is clear and unambiguous, the court may not modify the contract or create an ambiguity where none exists." *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 726 P.2d 439, 443 (Wash. 1986). Here, the insurance policy expressed the deductible in terms of a percentage per occurrence. The policy does not expressly define "deductible." Under Washington law, "[w]e give undefined terms in a policy their popu-

lar and ordinary meaning, turning to dictionaries if the plain meaning of the term is not clear." *State Farm Fire & Cas. Co. v. English Cove Ass'n, Inc.*, 88 P.3d 986, 989 (Wash. Ct. App. 2004) (footnotes omitted). Only after Washington courts examine the dictionary meaning of a term is ambiguity evaluated. *See id.* 989-91. The Washington Supreme Court has examined both standard and insurance-specific dictionaries in order to divine the plain meaning of terms in an insurance contract. *See Boeing Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d 507, 511 (Wash. 1990). The term "deductible" is defined by one insurance dictionary cited by the Washington Supreme Court as the "[a]mount of loss that insured pays in a claim." Barron's Dictionary of Insurance Terms 124 (4th ed. 2000). Similarly, the Insurance Information Institute defines deductible as "[t]he amount of loss paid by the policyholder. Either a specified dollar amount, [or] a percentage of the claim amount." http://www.iii.org/media/glossary/alfa.D; *see also* Black's Law Dictionary 444 (8th ed. 2004) ("Under an insurance policy, the portion of the loss to be borne by the insured before the insurer becomes liable for a payment."). Each definition of deductible defines the term only in relation to the amount of loss suffered, which is the same as the claim amount, and we should do the same.

A commonsense reading of the policy dictates that the deductible was expressed as a percentage because it could only be determined by reference to a claim made against the policy—and thus that the deductible was a percentage of the claimed loss. The insured value of the various properties was known, and if a fixed deductible based on those values was intended, it could easily have been expressed in the contract. The majority goes astray by failing to follow Washington State rules of interpretation and incorporating the ambiguity it finds in the term "occurrence" into what should be a straightforward analysis of the plain meaning of "deductible."