[No. 32788. Department Two. August 5, 1954.]

GARFIELD TAYLOR, *Appellant*, v. HERBERT TALMADGE *et al.*, *Respondents and Cross-appellants.*[1]

[1]Reported in 273 P. (2d) 506.

*Brown & Millhouse*, for appellant.

*J. W. Kindall* and *Lester C. Voris*, for respondents and cross-appellants.

SCHWELLENBACH, J.—Garfield Taylor is the owner of the south half of the southwest quarter of section 23, township 38, N. R. 5, EWM, in Whatcom county, which he acquired by purchase in December, 1942. He also owns the northwest quarter of the northwest quarter of section 26, same township and range. Adjoining it to the east is the northeast quarter of the northwest quarter, which is owned by Herbert Talmadge and wife. Both of these pieces are directly south of Taylor's property in section 23.

In 1952, Talmadge caused a survey to be made to determine the true north boundary line of section 26. When this was determined, he bulldozed and cleared a line, dug holes, and set posts, intending to erect a fence on the line. This was in November or December of 1952. Taylor, feeling that Talmadge was encroaching on his property and was preventing him from using a logging road which he had built over it, commenced action to restrain Talmadge and to recover damages. At that time, a temporary injunction was issued enjoining defendants from proceeding with the building of the fence.

The trial court found the north boundary line of section 26 to be located as contended for by Talmadge; found the sixteenth corner on the north boundary line of section 26 (northwest corner of Talmadge property and northeast corner of the Taylor property) to be located as contended for by Talmadge; but found that, because of adverse possession, Taylor was the owner of a triangular strip of land commencing at the north quarter corner of section 26, extending westerly 1,320 feet along a fence then in existence,

thence northerly ninety feet to the north boundary line, thence easterly approximately 1,320 feet along the north boundary line to the north quarter corner, the point of beginning. The court also allowed judgment to plaintiff in the sum of $25 and to defendants in the sum of $202.50.

Plaintiff appeals on the question of damages and as to the location of the sixteenth corner, resulting in a difference of 22.3 feet in the location of the north and south line dividing the two properties. Defendants cross-appeal on the question of adverse possession.

In order to adequately discuss the issues in this appeal, we find it necessary to insert a sketch of the property involved. We shall use one found in respondents' brief, and shall refer to it from time to time.

Two corrections should be noted. The distance of the north line is 1342.3 feet instead of 1342.8 feet. The distance between the north-south line as found by the court, and the line claimed by Taylor, is 22.3 feet instead of 23.2 feet.

The surveyor and engineer employed by Talmadge prepared a map of section 26 from their survey notes. The map was introduced in evidence as defendants' exhibit 1. It was placed on an easel in the court room and was referred to constantly by all of the witnesses. The surveyors had no difficulty locating the northeast section corner. Its location

was agreed upon by everyone, as was the north quarter corner. They were "found" corners. From these corners, the surveyors proceeded to locate the northwest section corner. They then ran a direct line between the northwest section corner and the quarter corner, and located the sixteenth corner half way between the two. Having located the sixteenth corner, they then ran a line south as the dividing line between the Taylor and Talmadge forty-acre tracts. The north line of each tract was 1,342.3 feet instead of the usual 1,320 feet. However, Mr. Van Ordel, the engineer, testified that it is more unusual than usual to find exactly 1,320 feet across a "forty."

Taylor and his witnesses located the northwest section corner some distance south of the corner found by Talmadge's surveyors. They ran a line westerly from the quarter corner a distance of 1,320 feet extending along the line of the old fence, as shown in the sketch, with the result that they located the sixteenth corner ninety feet south and 22.3 feet east of the corner found by Talmadge's surveyors. As stated above, the trial court found the sixteenth corner to be as contended for by Talmadge.

There is no competent evidence in the record which preponderates against the court's finding as to the location of this corner. The attorneys, by their questions, and the witnesses, by their answers, continually pointed to exhibit 1 to explain their questions and answers, without placing anything in the record to show where they were pointing. For example, "A. There was a corner here (indicating)" . . . "and they started here (indicating on exhibit 1), and run this way and started over here and came this way." The writer of this opinion had exhibit 1 before him all of the time that he was reading the statement of facts. Every time reference was made to the exhibit, the writer would look at it, but would be unable to tell where the witnesses were pointing. The trial court, on the other hand, was able to follow the testimony. We therefore agree with the court's finding.

The testimony concerning adverse possession, however,

is much more understandable. The fence shown in the sketch was built about 1924. It extended westerly from the north quarter corner for a distance of 670 feet. There was credible testimony that it was the dividing line between the north and south properties. Leonard Stone, who owned the eighty acres north of the property in dispute, and which he sold to Taylor, testified:

"Q. Now, there—when you had it, was there an old fence there running along the southerly line of it? A. There was an old fence running along there. Q. It didn't go clear through? A. No. It only went about six hundred feet, five or six hundred feet. Q. And you used up to that line on the south? A. Well, I used up to that fence, all we ever did. I don't know, we never expected a line or anything, as I understood, because we never had it surveyed. Q. But that is the way you used up to it on your south and they used up to it on their north? A. Yes. I knew where that corner was there (indicating on Exhibit 1), and this one up here, but now, I couldn't swear where that corner was. Q. You mean the quarter corner? A. Yes. Irvin wanted to show it to me. We were up in there one day and he showed me that sixteenth corner there. I started to build a fence at one time, and he showed it to me so I didn't get over, but I didn't get over anyway, because I just wanted to get around a field I had there, just to fence the cows out. That's all we ever used that fence for. Q. You had a pasture up here (indicating on Exhibit 1) and you fenced around that? A. Yes. Q. And ran it down to this fence below, on the south side? A. Yes."

Charles Ellis, who had worked for Taylor since 1943, testified concerning the fence:

"Q. Was there a fence connecting to it on the south, on the Talmadge place? A. I couldn't say. There was one connected onto it from the north. Q. Running into the Stone property? A. It went up around the field. There was a field up there, a meadow. Q. Something like this (indicating on Exhibit 1)? A. Yes. Q. And it just ran rampant around the meadow? A. Yes. Q. And Mr. Taylor was grazing stock up in here (indicating)? A. Yes, and down to that fence."

Taylor testified that, when he bought the land from Stone, the fence was pointed out to him as the line. Mrs. Florence Gardner, who sold to Talmadge in 1943, testified that, during all of the time she owned the property (which she ac-

quired in 1924), she used and considered the fence as the boundary line.

There was some testimony that there were trees and brush extending in a westerly direction along the line of the fence. Their extent, however, was very indefinite, and the area to the north was not cleared. It consisted of second growth timber. About 1950, Taylor extended the fence as indicated on the sketch.

Possession, to be adverse, must be actual and uninterrupted, open and notorious, hostile, and exclusive, and under a claim made in good faith. *Scott v. Slater*, 42 Wn. (2d) 366, 255 P. (2d) 377. The mere possession of land beyond the real boundary is not sufficient to make such holding adverse, but there must be in addition an intention to claim title to the disputed land and to hold it as the owner. *Brown v. Hubbard*, 42 Wn. (2d) 867, 259 P. (2d) 391. A fence not erected as a boundary fence, but rather as one to control pasturage, would not give rise to possession of such character as would establish an adverse title. However, the mere building of a fence on disputed land for pasturage would not militate against an adverse holding, if the use of such land were an incident under a claim of right. The question in each case is whether a property fence is maintained as a matter of convenience, or under a claim of ownership. *Young v. Newbro*, 32 Wn. (2d) 141, 200 P. (2d) 975. In *Johnson v. Conner*, 48 Wash. 431, 93 Pac. 914, we said:

"Of course, it is not necessary for a person claiming a certain tract of land adversely to prove that he has actually occupied, used, improved, or inclosed all of said tract. But it must appear that he openly and notoriously claimed the entire tract and that his possession, use, or improvement of a portion thereof was intended to hold, not merely that particular portion, but the whole of the entire tract."

In the present case, we are satisfied that there is sufficient testimony to warrant a finding that, as to the land between the north line and the original 670 foot fence, appellant and his predecessor held it in a possession which was actual, uninterrupted, open and notorious, hostile and exclusive, under a claim of right made in good faith. It is true

that the fence was originally built for the purpose of holding cattle. Nevertheless, it was recognized by everyone as the boundary between the properties of the parties.

However, as to that portion lying west of that point, we are of the opinion that the possession of appellant and his predecessor does not meet the test outlined above. The record does not show that there was an intention to claim title to that land and to hold it as the owner. We cannot say from the evidence that it was occupied in the manner required to make its possession adverse.

We find no merit in appellant's contention that both the east-west and north-south boundaries have been established by agreement, acquiescence, or estoppel.

The judgment is modified by limiting the land awarded to appellant by virtue of adverse possession to that triangular strip of land commencing at the north quarter corner of section 26, thence extending westerly along the line of the old fence for a distance of 670 feet, thence northerly to the north boundary line, thence easterly along the north boundary line to the point of beginning. In view of the above, we do not believe that either party is entitled to damages. Furthermore, we do not believe that damages were properly proved. The judgment is, in all other respects, affirmed. Neither party shall recover costs on appeal.

GRADY, C. J., HILL, DONWORTH, and WEAVER, JJ., concur.