[No. 44907. En Banc. October 5, 1978.]

STANLEY E. MUENCH, ET AL, *Petitioners,* v. E. C. OXLEY, ET AL, *Respondents.*

*James R. Dickens* (of *Karr, Tuttle, Koch, Campbell, Mawer & Morrow*), for petitioners.

*James B. Finlay,* for respondent Transamerica Title.

HICKS, J.—Petitioners, Stanley E. Muench and his wife, sought review of a decision by the Court of Appeals affirming the trial court's judgment (1) quieting title to certain real property in respondents, E. C. Oxley and his wife; and (2) denying liability of respondent, Transamerica Title Insurance Company, under a policy of title insurance previously issued to Muench. We granted discretionary review, and reverse as to number 1 and affirm as to number 2.

In 1974, Muench purchased 5.5 acres of densely covered unimproved land north of and bordering the South Bend–Palix road in Pacific County. Title to the property was insured by Transamerica. The earnest money agreement entered into by Muench, as well as Transamerica's preliminary commitment for title insurance, stated that the title policy would contain no exceptions other than those expressed in the standard policy form. Muench was not provided with a copy of the standard policy form prior to the completion of the sale and he did not ask to see one.

Two years prior to the sale, Muench's vendor together with two neighbors, had caused a survey of their properties to be made. The surveyor had placed stakes establishing the corners of what became Muench's west boundary line. East of the surveyed line, at a distance varying from 40 to 100 feet, were the remnants of an old fence in a dense growth of trees and underbrush. The fence was so dilapidated and ran at such an angle to the true line that the surveyor ignored it.

Some time after his purchase, Muench became aware that Oxley, his neighbor to the west, claimed the old fence as the boundary between his property and Muench's. If this fence rather than the staked line proved to be the dividing line, Muench was about an acre short of the quantity of land he thought he had purchased.

After learning of Oxley's claim, Muench demanded that his title company, Transamerica, represent him in an action against Oxley. Transamerica rejected the demand contending that Oxley's claim was not covered by the policy. It based this contention on the following exception which appeared in the standard policy form:

GENERAL EXCEPTIONS: 1. Encroachments or questions of location, boundary and area, which an accurate survey may disclose . . . rights or claims of persons in possession, or claiming to be in possession, not disclosed by the public records . . .

After Transamerica refused to represent him, Muench brought this quiet title action against Oxley and joined Transamerica as a codefendant. Oxley counterclaimed against Muench, claiming title to the old fence.

At trial, testimony was taken from the parties, neighbors, a previous owner, the son of former tenants, the surveyor, and the local agent of the title company. The testimony of Mills, Transamerica's local agent, revealed that, at the time of the closing conference with Muench he was aware of a dispute between Oxley and a Mr. Bashore growing out of the same survey that established the west boundary of the Muench property. Bashore was a neighbor immediately south of the South Bend–Palix road, and the boundary in contention involved a southward extension of the line the survey established as the Muench western boundary. Mills did not reveal this dispute to Muench. At trial, Muench testified that had he been advised of the Oxley–Bashore controversy, he would not have purchased his property.

Following trial, judgment was entered on the counterclaim quieting title in Oxley to the contested property and dismissing Muench's claim against Transamerica with prejudice. On appeal, the Court of Appeals, Division Two, in an unpublished opinion, affirmed.

As to the boundary dispute, the Court of Appeals found that there was substantial evidence in the record to support the trial court's finding that for over 30 years Oxley's pre-

decessors continually, notoriously, adversely and in a hostile manner occupied the land up to the fence and that they considered the fence to be the eastern boundary of the property. Despite the evidence in the record, we are unable to agree with either the Court of Appeals or the trial court that title to the contested property should be quieted in the Oxleys.

It is unclear from the trial court's findings of fact, conclusions of law and judgment whether its decision was based on the theory of adverse possession or on the theory of acquiescence. There is considerable indication in the record that the court relied on the latter theory. However, one conclusion of law contains the elements of adverse possession and the Court of Appeals rested its decision on that conclusion without discussing acquiescence. Since the basis of the trial court's decision is unclear, and since the briefs of the parties touch upon both theories, we consider the application of each.

Under the doctrine of acquiescence, recognition by neighboring owners of a fence as the true boundary between their properties and not just as a barrier, is sufficient to establish the fence as the legal line. To prevail, the party claiming must demonstrate agreement or acquiescence in the line by both parties for the period required to establish adverse possession. *Houplin v. Stoen,* 72 Wn.2d 131, 431 P.2d 998 (1967); *Thomas v. Harlan,* 27 Wn.2d 512, 178 P.2d 965, 170 A.L.R. 1138 (1947). The acquiescence must be proved by evidence which is clear, cogent and convincing. *Houplin v. Stoen, supra; Thomas v. Harlan, supra.*

In this case, there simply was no evidence adduced that any of Muench's predecessors recognized the fence as the true property line. The only testimony that even so much as touched on the matter was that of Harvey Pierson, whose parents were for many years tenants on the Oxley property, and he merely testified that he was unaware of any controversy as to the boundary location. However, Pierson also testified that no one occupied the Muench

property during those years and that his family's closest neighbor lived a half of a mile or more in the opposite direction. In view of that testimony, the fact that he was not aware of a controversy does not constitute clear and convincing proof that the fence was recognized as the property line. We, therefore, cannot agree that the boundary was established by acquiescence. *Houplin v. Stoen, supra.*

As to adverse possession, title to property may be acquired by possession which is open and notorious, actual and uninterrupted, hostile, exclusive and under a claim made in good faith. *Taylor v. Talmadge,* 45 Wn.2d 144, 273 P.2d 506 (1954). The necessary period of possession is 10 years. RCW 4.16.020. The initial entry on the property (here the construction of the fence) may be by mistake and adverse title may still be obtained if the claimant establishes a notoriously evinced intent to claim the land to the disputed line. *Krona v. Brett,* 72 Wn.2d 535, 433 P.2d 858 (1967).

One claiming title by adverse possession must prove the adverseness of the possession. No presumption runs in favor of the purported adverse holder. Rather, possession will be presumed to be in subordination to the title of the true owner. *Hawk v. Walthew,* 184 Wash. 673, 52 P.2d 1258 (1935).

From the facts here, it is clear that if title to the contested property was obtained by adverse possession, that title must have been established before Oxley acquired the land. None of the trial court's findings states that possession to the fence line continued after 1967 when Oxley contracted to purchase the property and he does not make that contention on appeal. Moreover, the testimony makes clear that, at the time he took possession of the property, the fence itself was in a dilapidated condition and the ground on either side was heavily covered by trees and underbrush. Thus, Oxley cannot be said to have been in such possession as would put a person of ordinary prudence on notice of a hostile claim. *Fadden v. Purvis,* 77 Wn.2d 23, 459 P.2d 385 (1969).

■ It is also clear that Oxley's immediate predecessor in interest, Jerry L. Finke, acquired no title by adverse possession. There was no substantial evidence that during his ownership from approximately 1958 to 1967, the fence was maintained in a condition that might impart notice of a hostile claim. Moreover, even if the fence was so maintained for some period of Finke's ownership, that possession may not be "tacked" to the possession of his predecessor to establish the 10–year term. Successive periods of adverse occupation by different owners may be united or "tacked" in order to meet the statutory requirement for acquiring title by adverse possession. *Faubion v. Elder*, 49 Wn.2d 300, 301 P.2d 153 (1956).

In this case, however, there is no evidence in the record regarding the possession of Finke's predecessor, Matt Beck. Since Oxley proved nothing concerning the character · or duration of Beck's possession of the property, that possession may not be "tacked" to that of Finke to establish the necessary 10–year holding.

As far as we can determine, Oxley's claim must be based entirely on the possession of the parents of Harvey Pierson. Pierson testified regarding his years as a boy growing up on the Oxley property and to his parents' continued occupancy after he left home. They occupied the property as renters from 1918 to 1947. Harvey Pierson was just short of 11 years of age when his parents moved on the land and he considered it his home until 1930. Thereafter, he visited his parents on an average of once a month until they left the property in 1947.

From Pierson's testimony, there is no question that he considered the fence to be a boundary of the property upon which his parents were living. The fence was in good repair during his years at home and his father kept the land well cleared and used it for pasture up to the fence. A snapshot of Pierson taken about 1928 plainly shows the fence in the background and the well–cleared field which it bounded.

We have recognized that one who himself did not acquire title by adverse possession may rest a claim to title on the

adverse possession of a predecessor in interest. *El Cerrito, Inc. v. Ryndak,* 60 Wn.2d 847, 376 P.2d 528 (1962). The successor's claim is based on the fact that his predecessor who possessed with the requisite adversity for the necessary period acquired title comparable to that acquired by deed. *El Cerrito, Inc. v. Ryndak, supra;* F. Clark, *A Treatise on the Law of Surveying and Boundaries* § 544 (4th ed. Grimes 1976). Once the successor has established his predecessor's title, he must prove that the title was subsequently conveyed to him. *El Cerrito, Inc. v. Ryndak, supra; Du Val v. Miller,* 208 Ore. 176, 300 P.2d 416 (1956); 2 C.J.S. *Adverse Possession* § 161(a) (1972).

In this instance, Oxley failed completely to prove who may have acquired title to the contested property as a result of the Piersons' occupancy, and to whom, if anyone, the acquired title was conveyed. There is, for that matter, no substantial evidence as to who owned the property rented by the Piersons. The only evidence bearing on ownership during the Piersons' occupancy was Harvey Pierson's statement that for the greater portion of the period from 1918 to 1947, his parents "rented from" the Continental Land Company, a Spokane based company. Whether that company owned the land or was only managing it for someone else was not developed. Assuming it owned the property, the record is absolutely silent as to when it divested itself of title and to whom.

The only evidence regarding any prior ownership of the land came from Jerry Finke, who testified that he purchased the property in approximately 1958 from Matt Beck and his brothers and sisters. Thus, Oxley failed to prove both that adverse title to the disputed property was acquired by a predecessor and that such title was subsequently conveyed to him. Accordingly, the trial court's judgment quieting title to the property in Oxley cannot stand.

As to the claims against Transamerica, the trial court and the Court of Appeals agreed that this action was

excluded from coverage under the policy and that Transamerica therefore had no obligation to represent Muench. We again set forth the general exceptions in pertinent part: "1. Encroachments or questions of location, boundary and area, which an accurate survey may disclose . . . rights or claims of persons in possession, or claiming to be in possession, not disclosed by the public records . . ." Muench argues this provision was not binding as it was neither bargained for nor known to him at the time of closing. It is his contention that to be given effect, the exception should have been set forth in prominent type in the preliminary commitment and not merely referenced.

■ Even though not specifically bargained for, we do not agree that the exception should not be given effect in this instance. Cases where disclaimers of warranty in sales contracts have been held inoperative (*Berg v. Stromme,* 79 Wn.2d 184, 484 P.2d 380 (1971); *Testo v. Russ–Dunmire Oldsmobile, Inc.,* 16 Wn. App. 39, 554 P.2d 349 (1976)), are inapposite here. In those cases, the written provisions purported to disclaim warranties which either were expressed to the purchaser or arose by implication from the sale. Here, there was nothing, express or implied, which suggested that the title insurance policy insured more than the record title to the property. Muench himself apparently understood this to be the case. In his letter to Transamerica's agent, he stated, "I know that title insurance does not relate to 'on the spot matters' on the actual property. But this problem may be more one of legally registered property descriptions, kept at the court house."

Moreover, the standard form policy here was not offered strictly on a "take it or leave it" basis. Another policy, which does insure against defects not of record, was available at a higher premium. Thus, the extent of risks insured against was negotiable in the sense that a more extensive coverage could be obtained.

Further, we do not agree that the provision should be denied effect because it was not set forth in the preliminary

commitment. Certainly, it would seem desirable that general exceptions be specifically set forth in the preliminary commitment or that a copy of the standard form policy be delivered to the insured at the same time as the preliminary commitment. At the very least, this case demonstrates that an insured should receive a copy of the standard form policy in a closing conference conducted at the title company office. We cannot say, however, that Transamerica's failure to take either course renders the provision nugatory.

Both the earnest money agreement and the preliminary commitment made references to the exceptions, and the policy form setting them forth was available for Muench's examination. Moreover, as we have discussed above, the exclusions were apparently consistent with Muench's understanding of the coverage provided. Accordingly, we hold that the exceptions are enforceable in this instance.

Nonetheless, we have noted Muench's evidence to the effect that title insurance companies nationwide use little of the premiums collected for the payment of losses and virtually nothing for attorney fees in the defense of insured persons. Muench argues that purchasers of title insurance, in general, are not realizing their justified expectations when title policies contain such broad emasculating exceptions. We are not unsympathetic to such arguments, but we believe they should first be presented to the insurance commissioner and the legislature. We do believe title insurance companies should more effectively inform purchasers what they are *not* getting when a preliminary commitment for a particular policy of insurance is issued.

Muench next argues that even if the exception is otherwise valid, it is ambiguous and must be construed in his favor. We recognize and reaffirm the rule that insurance contracts must be liberally construed in favor of an insured. But an equally important part of that rule is that plain language is not to be disregarded. *Davis v. North Am. Accident Ins. Co.,* 42 Wn.2d 291, 254 P.2d 722 (1953). When language is clear, there is no room for construction.

*Morgan v. Prudential Ins. Co. of America,* 86 Wn.2d 432, 545 P.2d 1193 (1976).

Muench argues that the phrase "questions of location, boundary and area, which an accurate survey may disclose" is ambiguous in this instance. He bases his argument on the premise that since there had been an accurate survey which did not disclose the potential controversy, the exception does not apply. Transamerica counters, and we think correctly, that the survey was not accurate since the old fence was not indicated. At trial, when the surveyor testified regarding the existence of the old fence, the survey was completed and the basis of the boundary dispute revealed. We find no ambiguity in the cited phrase as it applies in this case. Muench also contends that the term "possession" in the exception is ambiguous. We find it unnecessary to discuss that term since this action is precluded by the phrase just discussed.

Muench next argues that even if part of Oxley's claim was excepted, Transamerica still had a duty to represent him under the terms of the policy, because one of Oxley's theories in the counterclaim was that the fence and the true record boundary were one and the same. This claim is principally based on an Oxley answer to an interrogatory which demanded to know if Oxley claimed by record title or by adverse possession. Oxley answered as follows:

> I have not erected a fence, I have repaired the existing fence. If the fence is on the government subdivision line, I claim because of record title and the location of the fence. If the fence is not on the subdivision line, I claim by adverse possession because I and my predecessors have occupied the premises to the line for more than ten years under the claim that the fence was the line.

We do not find that the foregoing answer supports Muench's contention that Oxley claimed title as a matter of record. The thrust of the language clearly manifests a claim of adverse possession based upon occupancy to the old fence. Even if this answer could be read as a claim that the fence line and the line in the legal description were one and

the same, that assertion would be excepted. Such a claim is not one of record, but presents a question of boundary "which an accurate survey may disclose."

Muench's final contention is that Transamerica's agent, Mills, breached his duty when he failed to disclose a boundary dispute between Oxley and Bashore, a neighbor directly south of the Muench property but separated therefrom by the South Bend–Palix road. While Mills knew of the controversy, he did not know of the old fence on the Muench property. Consequently, there was nothing to alert him to any relationship between an argument over a boundary location across the road and the potential for such a dispute involving the property being acquired by Muench. Had any evidence indicated that Mills was aware that the Oxley–Bashore boundary controversy, in part, stemmed from an extension of the fence line on the Muench property to property south of the South Bend–Palix road, a different question would be presented. There is no such evidence. We can find no reason for Mills to have believed that this dispute was of any significance to Muench. Consequently Mills, as Transamerica's agent, was under no duty to disclose his knowledge to Muench.

The trial court's judgment quieting title to the contested property in the Oxleys and the affirmance thereof by the Court of Appeals are reversed. As to the issues concerning Transamerica, the judgment of the Court of Appeals is affirmed.

WRIGHT, C.J., and ROSELLINI, HAMILTON, STAFFORD, UTTER, BRACHTENBACH, HOROWITZ, and DOLLIVER, JJ., concur.