[Nos. 29129-7-I; 29992-1-I. Division One. September 7, 1993.]

DENNY'S RESTAURANTS, INC., *Appellant,* v. SECURITY
UNION TITLE INSURANCE COMPANY,
*Respondent.*

*Michael H. Rorick* and *Bennett & Bigelow,* for appellant.
*Stephan E. Todd* and *Tousley Brain,* for respondent.

GROSSE, J. — Denny's Restaurants, Inc. (Denny's) appeals an adverse decision on summary judgment in favor of Security Union Title Insurance Company (Security Union) with respect to coverage. We reverse, holding that this court's decision in *Transamerica Title Ins. Co. v. Northwest Bldg. Corp.*, 54 Wn. App. 289, 773 P.2d 431, *review denied*, 113 Wn.2d 1008 (1989), relied on by the trial court, is fundamentally flawed and must be disregarded.

In 1982, in conjunction with the purchase of 35 Vip's restaurants, Denny's negotiated the purchase of extended coverage title insurance for the properties. One of those properties at issue here is located in Mount Vernon, Washington. Vip's held that property under an unrecorded 20-year lease that was assigned to Denny's in the sale. Prior to closing, Denny's applied for title insurance with Security Union and provided a copy of an unrecorded long-term lease which contained a metes and bounds legal description. This legal description, however, did not describe Vip's property. It erroneously described property adjacent to Vip's. Security Union detected the erroneous legal description and in its preliminary title commitment substituted the legal description contained in Vip's recorded memorandum of lease. The memorandum of lease contained a description that omitted the west 60 feet of the restaurant site containing the landscaping, parking, and signage. Security Union apparently did not detect this discrepancy.

Security Union then issued a preliminary title commitment. The preliminary commitment did not disclose the discrepancies in legal descriptions between the unrecorded lease and the recorded memorandum of lease, nor did it reveal any boundary or encroachment problem although Security Union sent an inspector out to visit the site. After a visual inspection, the record indicates the inspector established property lines according to the landscaping and fencing and apparently included the west 60 feet of parking.[1]

---

[1] The inspector's A.L.T.A. (American Land Title Association) Inspection Sheet states:

"Existing commercial ppty. in mall — established property lines by landscaping & fencing. IP at NW corner — looks like maybe lot corner. Looks ok to me."

Two basic types of title policies are available: standard and extended coverage. The standard policy schedule B exempts coverage for most off-record defects.[2] For an additional premium, the insured may purchase an extended coverage policy that omits the standard schedule B exemptions. The preliminary commitment issued by Security Union to Denny's sets forth exemptions from coverage in schedule B for both standard and extended coverage insurance.

Prior to closing, Denny's purchased the extended title insurance policy from Security Union.[3] This extended policy omitted the standard schedule B policy exclusions for off-record defects disclosable by accurate survey.[4] The policy also deleted the exemption for defects relating to the unrecorded leasehold interest.[5] This provision was deleted after Denny's submitted the Vip's long-form lease to Security Union. Denny's subsequently completed the purchase of the Mount Vernon restaurant site on the basis of the favorable title insurance commitment.

After the sale took place, the Denny's restaurant conducted business for several years without incident. In 1986,

---

[2]Schedule B exempts coverage for off-record defects such as encroachments, matters of boundary and location, unrecorded easements, and adverse possession claims.

[3]The policy of title insurance contained the following language:
"SUBJECT TO THE EXCLUSIONS FROM COVERAGE, . . . the company, insures . . .:
"1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;
"2. Any defect in or lien or encumbrance on such title;
"3. Lack of a right of access to and from the land; or
"4. Unmarketability of such title."

[4]The omitted standard schedule B exclusions, which were set forth in the preliminary commitment dated March 9, 1982, included the following: "Encroachments or questions of location, boundary and area, which an accurate survey may disclose . . .".

[5]"Any defect in or invalidity of, or any matters relating to the leasehold/subleasehold estate described in Schedule A which would be disclosed by an examination of the unrecorded lease/sublease referred to in the memorandum thereof." Schedule B of amended commitment for title insurance exhibit A (Mar. 18, 1982).

Denny's learned that the western 60 feet of the restaurant site was not owned by the original lessor but was owned by the City of Mount Vernon. The original lessor had entered into a terminable lease with the City in 1976 that allowed the lessor to use the city property for parking. The lease provided the City could terminate on 30 days' written notice. In 1988, the City gave Denny's notice of termination. By letter dated May 4, 1988, Denny's contacted Security Union, enclosing the notice of termination and tendering the defense of title. On May 20, 1988, Security Union notified Denny's that the policy did not insure the disputed parking area. The City brought suit on January 9, 1989, to quiet title and eject Denny's from the western 60 feet. Denny's subsequently lost the use of all but 15 parking spaces. Denny's was also required to remove its signs and rearrange the configuration of the remaining parcel, as well as arrange for temporary parking elsewhere. Denny's maintains that if it loses the temporary parking area, it will be forced to abandon the restaurant.

Denny's filed suit against Security Union alleging that Security Union had breached its contract with Denny's under the extended coverage title policy and also alleging that Security Union had breached its duty to search for and disclose any title defects in the restaurant property. Security Union successfully moved for partial summary judgment on Denny's contract claims. The trial court denied Denny's subsequent motion to amend its complaint to allege mutual mistake. Security Union moved for summary judgment on the remaining tort claims, and a final judgment was entered in its favor.

On appeal, Denny's contends the trial court erred when it granted Security Union's motion for summary judgment and dismissed Denny's claims for breach of the title insurance contract and negligence in failing to disclose the discrepancies in the legal description. When reviewing a summary judgment, the reviewing court must take the position of the trial court and assume facts in a light most favorable to the nonmoving party. *Douchette v. Bethel Sch. Dist. 403*, 117

Wn.2d 805, 818 P.2d 1362 (1991); *Everett v. American Empire Surplus Lines Ins. Co.*, 64 Wn. App. 83, 823 P.2d 1112 (1991). Summary judgment is properly granted when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); *Douchette v. Bethel Sch. Dist. 403*, 117 Wn.2d at 808-09.

Denny's contends that genuine issues of material fact exist in its contract claim and summary judgment was therefore improperly granted. Denny's bases this contention on three different theories and argues (1) under *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990), extrinsic evidence should be allowed to prove the parties' intent to insure against encroachments and matters of boundary and location; (2) Security Union impliedly agreed to cover defects that would have been uncovered by examination of the unrecorded lease and (3) the extension of Denny's parking stalls onto the adjoining property renders title to the lot unmarketable.

### Extrinsic Evidence of Intent

Denny's asserts the parties intended the extended coverage insurance policy to insure against just such a risk as occurred in this case, and under *Berg v. Hudesman, supra,* extrinsic evidence should be allowed to prove that intent. Denny's points out the original preliminary standard title commitment referred to exclusions for "encroachments or questions of location, boundary, and area, which an accurate survey may disclose . . .". The extended coverage policy omitted the standard policy exemptions, and Denny's argues the extended policy thus impliedly provides protection for encroachments and questions of boundary. Additionally, Denny's asserts Security Union impliedly agreed to insure for defects that would be revealed by an examination of the unrecorded long-term lease because the policy deleted that exception as it existed in the preliminary commitment. Denny's accordingly assumed that any defects in the leasehold interest would consequently be insured.

■ The *Berg* decision was intended to reconcile previous inconsistent case precedent and provide a uniform guideline for contract interpretation. The *Berg* court rejected the plain meaning rule ¯and adopted the "context rule", holding that extrinsic evidence was admissible to interpret the meaning of a contract term. *Berg*, 115 Wn.2d at 663. The *Berg* court made a distinction between contract interpretation and contract construction. Interpretation is a determination of fact; it is the process that ascertains the meaning of a term by examining objective manifestations of the parties' intent. Construction is a question of law; it is the process that determines the legal consequences that follow from a contract term. *Berg*, 115 Wn.2d at 668. In order to interpret the original meaning of a contract term, extrinsic evidence is admissible, even if the term appears unambiguous. *Berg*, 115 Wn.2d at 669.

The impact of *Berg* on the interpretation of insurance contracts has not yet been specifically addressed by the courts of this state. Denny's argues that under *Berg*, evidence of industry practice and Security Union's own internal memoranda should be admissible to demonstrate the parties' true intent that the policy was purchased to cover questions of off-record encroachment and boundary. Security Union argues that *Berg* does not apply to insurance contract interpretation, which is strictly a matter of law, relying on *Roller v. Stonewall Ins. Co.*, 115 Wn.2d 679, 682, 801 P.2d 207 (1990) ("The interpretation of insurance policy language is a question of law.").[6]

Although *Berg* allows extrinsic evidence to interpret an existing contract term, it does not *obviate* the parol evidence

---

[6]The *Roller* case, addressing insurance contract interpretation, was indeed decided the same day and by the same court that decided *Berg*, yet the *Roller* case does not mention the *Berg* decision. Consequently, it is unclear whether the *Berg* interpretation analysis is applicable to insurance contracts. We note, however, that the Supreme Court has recently discussed *Berg* within the context of interpretation in insurance contracts. *See McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 733, 837 P.2d 1000 (1992). *See also Nationwide Mut. Fire Ins. Co. v. Watson*, 120 Wn.2d 178, 840 P.2d 851 (1992) (applying *Berg* in context of insurance release). *But see American Star Ins. Co. v. Grice*, 121 Wn.2d 869, 878, 854 P.2d 622 (1993) (allowing extrinsic evidence solely on the basis that language is ambiguous, without citation to *Berg*).

rule. In the instant case, Denny's is not attempting to interpret an existing written term, but rather undertakes to show that the parties intended to imply a term covering encroachments and boundary disputes. While extrinsic evidence is not admissible to contradict or supplement an integrated, unambiguous instrument, *Berg*, 115 Wn.2d at 670; *Max L. Wells Trust v. Grand Cent. Sauna & Hot Tub Co.*, 62 Wn. App. 593, 602, 815 P.2d 284 (1991), it may be admitted to prove additional consistent terms to a partially integrated agreement. In other words, if the written contract is not the complete expression of the parties' agreed-upon terms, additional terms may be proved if they do not contradict the written terms. *Berg*, 115 Wn.2d at 670; *Emrich v. Connell*, 105 Wn.2d 551, 556, 716 P.2d 863 (1986). This principle is set forth in the Restatement (Second) of Contracts § 216 (1981):

> (1) Evidence of a consistent additional term is admissible to supplement an integrated agreement unless the court finds that the agreement was completely integrated.
> (2) An agreement is not completely integrated if the writing omits a consistent additional agreed term which is
> (a) agreed to for separate consideration, or
> (b) such a term as in the circumstances might naturally be omitted from the writing.

■ The initial inquiry, therefore, is whether the agreement is integrated; in reaching that determination the court may consider evidence of negotiations and circumstances surrounding the formation of the contract.[7] If the agreement is not completely integrated, additional terms may be proved to the extent they are consistent with the written terms. *Berg*, 115 Wn.2d at 670 (citing *Emrich v. Connell*, 105 Wn.2d at 556). As illustrated by the Berg case itself, this inquiry is not an aspect of the "context rule". Thus, we need not apply that aspect of *Berg* to resolution of the issue in this case.

---

[7]Restatement (Second) of Contracts § 214 provides:
"Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish
 "(a) that the writing is or is not an integrated agreement;
 "(b) that the integrated agreement, if any, is completely or partially integrated;
 "(c) the meaning of the writing, whether or not integrated;".

 Although the issue of integration is a question for the trier of fact, under section 216 of the Restatement the payment of additional consideration for a consistent additional term is evidence that the agreement is not completely integrated. Similarly, evidence that the term is one that is naturally omitted from the writing under the circumstances shows the contract is not integrated. The facts of this case strongly support a finding that the parties' written agreement was not integrated. If reasonable minds are compelled to reach but one conclusion on an issue of fact, it may be determined as a matter of law.[8] *Allen v. State*, 118 Wn.2d 753, 760, 826 P.2d 200 (1992); *Ruffer v. St. Frances Cabrini Hosp.*, 56 Wn. App. 625, 628, 784 P.2d 1288, *review denied*, 114 Wn.2d 1023 (1990).

In light of the additional consideration paid by Denny's for the extended coverage premium and the parties' understanding that deleting the schedule B exclusions would provide additional coverage, reasonable minds must conclude the written terms of the contract do not express the parties' entire agreement. Although the policy contains an integration clause,[9] the courts of this state have repeatedly recognized that boilerplate integration clauses are inoperative if they are false; parties to a contract are not bound by incorrect statements of fact. *Emrich v. Connell*, 105 Wn.2d at 558;

---

[8] The Restatement position is consistent:

"If it is claimed that a consistent additional term was omitted from an integrated agreement and the omission seems natural in the circumstances, *it is not necessary to consider further the questions whether the agreement is completely integrated and whether the omitted term is within its scope,* although factual questions may remain. This situation is especially likely to arise when the writing is in a standardized form which does not lend itself to the insertion of additional terms." (Italics ours.) Restatement (Second) of Contracts § 216, comment *d.*

[9] Number 12 of the "Conditions and Stipulations" section of the policy provides:
**"12. Liability Limited to this Policy**

"This instrument together with all endorsements and other instruments, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company.

"Any claim of loss or damage . . . shall be restricted to the provisions and conditions and stipulations of this policy."

*Black v. Evergreen Land Developers, Inc.*, 75 Wn.2d 241, 250-51, 450 P.2d 470 (1969); *Sherman v. Lunsford*, 44 Wn. App. 858, 862 n.3, 723 P.2d 1176 (1986). Nor do we find our conclusion precluded by RCW 48.18.190 which states: "No agreement in conflict with, modifying, or extending any contract of insurance shall be valid unless in writing and made a part of the policy." This statutory provision is consistent with the common law parol evidence rule. The terms sought to be proved in this case do not conflict, modify, or extend the policy of title insurance; rather they elucidate unexpressed consistent policy terms.[10] The consideration of prior negotiations in this context therefore serves to clarify, not modify, the scope of the later executed written agreement. We find as a matter of law that the agreement is not completely integrated and additional extrinsic evidence may be considered to prove its unexpressed terms.

We note that this analysis is directly contrary to this court's holding in *Transamerica Title Ins. Co. v. Northwest Bldg. Corp.*, 54 Wn. App. 289, 773 P.2d 431, *review denied*, 113 Wn.2d 1008 (1989), which formed the basis for the trial court decision. The *Transamerica* court held that a policyholder insured under an extended coverage policy substantially identical to the policy in this case was not insured for the encroachment of parking stalls onto adjoining land. Transamerica successfully argued that policy protection was restricted to the legal description of land contained within the policy. This court agreed, finding that the policy terms were not ambiguous in themselves and refusing to interpret the policy as extending coverage to the surrounding land. The court found the encroaching parking stalls were expressly excluded from coverage by unambiguous policy terms defining insured "land". *Transamerica*, 54 Wn. App. at 293. Be-

---

[10]*See Continental Ins. Co. v. Paccar, Inc.*, 26 Wn. App. 850, 614 P.2d 675 (1980) (disallowing evidence of prior or contemporaneous agreements of the parties to modify or vary terms of policy, but finding RCW 48.18.190 does not bar such evidence to resolve ambiguity, even if agreement is fully integrated), *rev'd on other grounds*, 96 Wn.2d 160, 634 P.2d 291 (1981).

cause the court found the term "land" to be unambiguous as defined within the policy, it refused to consider any extrinsic evidence of industry custom or secondary authority:

> Northwest further contends that because it purchased extended coverage requiring Transamerica's deletion of the exclusion for "encroachments or questions of location, boundary and area" disclosed by an accurate survey, the policy inferentially provided coverage for such matters. We disagree. Provisions regarding surveys and encroachments appear nowhere in the policy. It is simply irrelevant that the policy as initially proposed and rejected contained those exclusions. The only authority Northwest cites in support of its contention that such coverage should be presumed are the Washington Real Property Deskbook and the alleged custom in the industry. The former is not sufficient authority and the latter would be relevant only if the terms of the insurance policy were ambiguous.

54 Wn. App. at 294.

The *Transamerica* court distinguished a Washington Supreme Court decision, *Shotwell v. Transamerica Title Ins. Co.*, 91 Wn.2d 161, 588 P.2d 208 (1978). The insurance policy in that case exempted a "right of way for existing roads". The existing visible road was only 15 feet in width. However, the insured parties later learned the property was subject to a wider 40-foot county right of way transversing the entire property, in which the visible road was located. The insurance company argued that it had not insured against a 40-foot-wide county right of way because the insured had not received title to the right of way from its grantor.[11] The court declined to hold that the description of land within the policy limited the insurance protection. The court noted that often policy descriptions were taken directly from the deed conveying title, and the purpose of the legal description in a title insurance policy was to identify the land covered, not to limit the protection. *Shotwell*, 91 Wn.2d at 169. To limit protection to that found in the legal description would effectively require purchasers of title insurance to become their own insurers. *Shotwell*, 91 Wn.2d at 170 (citing *San Jacinto Title Guar. Co. v. Lemmon*, 417 S.W.2d

---

[11]The legal description in both the conveyance and the policy excepted "right of way for existing roads". *Shotwell*, 91 Wn.2d at 163.

429, 431-32 (Tex. Civ. App. 1967)). Consequently, because the exemption for "right of way for existing roads" was ambiguous, the policy was construed in favor of the insured.

We find the reasoning of the *Shotwell* court more persuasive than *Transamerica*. The *Transamerica* court found that the definition of land contained within the title policy was not ambiguous; however, such a restrictive definition of land becomes ambiguous when construed together with the unexpressed additional terms extending coverage for off-record defects.[12] Ambiguity may be found not only in the express terms of an insurance contract, but also when language clear on its face becomes unclear when considered in light of extrinsic or collateral circumstances. *Continental Ins. Co. v. Paccar, Inc.*, 96 Wn.2d 160, 164, 634 P.2d 291 (1981).[13] The *Transamerica* holding overlooks such latent ambiguity because it fails to consider the circumstances and evidence pertaining to the deletion of previous exclusions. We find that *Transamerica*'s restrictive definition of "land" becomes ambiguous in light of circumstances indicating the purpose of the extended coverage policy is to insure against off-record defects, defects which may fall outside the legal description of land contained within the policy. Similarly, the insurance

---

[12]*See MacBean v. St. Paul Title Ins. Corp.*, 169 N.J. Super. 502, 405 A.2d 405 (1979), wherein the court found that the insurance company's deletion of the schedule B exclusion for off-record defects disclosable by survey created an ambiguity in light of a provision incorporating by reference a survey showing no encroachments. The court held that under the "reasonable expectation" doctrine, a question of fact existed as to the extent the survey was insured. *MacBean*, at 508. Similarly, in *Enright v. Lubow*, 202 N.J. Super. 58, 70, 493 A.2d 1288 (1985), *cert. denied*, 104 N.J. 376 (1986), *modified in part on reconsideration* 215 N.J. Super. 306, 521 A.2d 1300, *cert. denied*, 108 N.J. 193 (1987), the court found that a survey attached to the policy created an ambiguity in light of an exclusion for the survey. The court found that a reasonable purchaser of insurance would expect that the purpose of the attached survey is to insure the boundaries and conditions shown within the boundaries of the survey, and therefore the policy would be construed to insure against such matters. *Enright*, at 70.

[13]*But see Ryan v. Harrison*, 40 Wn. App. 395, 398, 699 P.2d 230 (where policy was not ambiguous, evidence of deleted exclusion was not considered to reveal ambiguity in policy), *review denied*, 104 Wn.2d 1003 (1985).

contract provision promising to insure against "any defect in or lien or encumbrance" on title consequently is ambiguous because the scope of coverage for off-record defects is unexpressed.

Moreover, contrary to *Transamerica's* conclusion, Washington precedent suggests that off-record defects may be insurable even when they pertain to land outside the strict legal description of the policy. In *Muench v. Oxley*, 90 Wn.2d 637, 647, 584 P.2d 939 (1978), *overruled in part on other grounds in Chaplin v. Sanders*, 100 Wn.2d 853, 676 P.2d 431 (1984), the insured bought property under a standard title policy exempting questions of boundary disclosable by accurate survey. A survey completed 2 years previous to the sale established the west boundary line of the property with stakes. An unmaintained fence was situated approximately 40 to 100 feet east of the line. After the insured had bought the property, a neighbor claimed title to the land west of the fence. The court stated that a claim by the neighbor that the fence marked the true record boundary was not a claim of record, but an issue of boundary disclosable by accurate survey and specifically exempted by the policy. *Muench*, 90 Wn.2d at 647-48. The claim of Denny's is largely analogous to the claim discussed in *Muench* and at a minimum raises an issue of fact as to whether this type of off-record defect is within the protection of an extended coverage policy. *Muench* further illustrates the ambiguity inherent in restrictively reading "land" to insure only for matters pertaining to land falling strictly within the legal description.[14]

In short, the *Transamerica* holding overlooks the rationale for extended coverage title insurance. Logically, a deleted exclusion indicates that the former exclusion is no longer applicable; any other result would undermine the rationale for paying additional consideration to obtain extended coverage. A close examination of the nature of modern title insur-

---

[14]*See also Walters v. Marler*, 83 Cal. App. 3d 1, 147 Cal. Rptr. 655 (1978), which found that when the majority of a home and its improvements were in fact located on the adjacent lot and not the insured lot, the matter came within the exclusion for off-record defects disclosable by accurate survey.

ance and decisions in both Washington and other jurisdictions further compels the conclusion that *Transamerica* misconstrues the nature and scope of extended coverage title insurance contracts.[15] Security Union's own internal memoranda clearly suggest that extended policies are intended to insure questions of off-record encroachment and boundary.[16] Moreover, the courts of this state have consistently recognized the differences in scope existing between standard and extended coverage title insurance protection.[17] The Washing-

---

[15]Several decisions from other jurisdictions construe title insurance policies substantially similar to the policy at issue in this case. These courts indicate that although the standard policy excludes matters detectable by an accurate survey, extended coverage may be obtained upon the title company's acceptance after survey or inspection by deleting the exclusion. *See Contini v. Western Title Ins. Co.*, 40 Cal. App. 3d 536, 543, 115 Cal. Rptr. 257, 261 (1974) (noting that for additional consideration, a title insurance company may extend coverage for off-record defects pursuant to its survey or inspection of the property); *U.S. Life Title Ins. Co. v. Hutsell*, 164 Ga. App. 443, 445, 296 S.E.2d 760, 763 (1982) (insurer may insure against inaccurate surveys by deleting standard schedule B exclusion); *Lick Mill Creek Apartments v. Chicago Title Ins. Co.*, 231 Cal. App. 3d 1654, 1659, 283 Cal. Rptr. 231, 233 (1991) (noting that standard policy generally insures against defects discoverable through public record; extended coverage ALTA policy insures against off-record defects such as discrepancies or conflicts in boundary lines and shortages in area, normally pursuant to survey or inspection). *See also Heyd v. Chicago Title Ins. Co.*, 218 Neb. 296, 354 N.W.2d 154 (1984) (coverage for boundary disputes, encroachments and overlaps disclosable by survey is omitted by specific exception in policy).

[16]Denny's obtained and submitted an internal memorandum from Security Union stating in part:

"The standard Schedule B exceptions . . . are for matters which are not disclosed by recorded documents or the public records. They relate instead to matters which could only be determined by off-record investigation, such as a survey, inspection or inquiry. . . ." Clerk's Papers, at 84.

"*Extended coverage* . . . requires an off-record investigation. In Washington this usually means inspection by the title company at a minimum. A recent survey may be required where the inspection is inconclusive . . . The reason a survey is required is to determine if *Extended Coverage* can be given." Clerk's Papers, at 85.

"Surveys are usually required for *Extended Coverage owner's* policies while an inspection may suffice for the loan policy." Clerk's Papers, at 87.

[17]*See Hoffman v. Connall*, 108 Wn.2d 69, 77, 736 P.2d 242 (1987):

The standard title insurance policy, however, usually does not require a survey and thereby does not guarantee that the purported boundaries are cor-

ton *Real Property Deskbook*'s explanation of standard and extended coverage policies is consistent with the observations of Washington courts, courts from other jurisdictions, and industry custom:

> A Standard Coverage Policy has *general exceptions* contained in Schedule B which for the most part relate to off-record matters. Most policies in Washington will pre-print them on Schedule B, and then add to them those exceptions which relate to the search of the records. . . .
>
> There are several forms that an Extended Coverage Policy will take. The most direct is to issue the same form of policy without some or all of the printed general exceptions, thus *extending the policy assurances with respect to a number of off-record matters.*

(Italics ours.) Washington State Bar Ass'n, *Real Property Deskbook* § 35.14, at 35-11 to 35-12 (2d ed. 1986).

In sum, a policy provision that is susceptible to two different and reasonable interpretations is ambiguous. The court may then determine the parties' intent in making the contract, examining the contract as a whole, the circumstances of its formation and the subsequent conduct of the parties. *Transcontinental Ins. Co. v. Washington Pub. Utils. Districts' Util. Sys.*, 111 Wn.2d 452, 457, 760 P.2d 337 (1988). We find the policy at hand is ambiguous with respect to the extent of coverage for off-record title defects. As a consequence, extrinsic evidence is admissible to determine the parties' intent. Disparity in premium costs may provide evidence of the parties' intended scope of coverage. *See Aetna Ins. Co. v. Kent*, 85 Wn.2d 942, 947, 540 P.2d 1383 (1975). If the contract remains ambiguous after examining extrinsic evidence, the contract will be construed in favor of the insured. *Transcontinental*, 111 Wn.2d at 457; *Shotwell*, 91 Wn.2d at 167

---

rect. To obtain such coverage, the buyers could have purchased an extended coverage policy that usually requires a survey. Such a policy affords a buyer greater protection than the standard policy.

(Footnotes omitted.) *See also Muench v. Oxley*, 90 Wn.2d at 645 (discussing standard form title insurance policy and noting, "Another policy, which does insure against defects not of record, was available at a higher premium."); *Bernhard v. Reischman*, 33 Wn. App. 569, 578, 658 P.2d 2 (noting that, "For an additional premium, a survey will be made and a policy issued to cover off-record defects discoverable by survey."), *review denied*, 99 Wn.2d 1016 (1983).

(citing *Witherspoon v. St. Paul Fire & Marine Ins. Co.*, 86 Wn.2d 641, 650, 548 P.2d 302 (1976)). In addition, a presumption exists that unless coverage is limited by a specific exclusion, coverage exists for matters not specifically excluded. *Phil Schroeder, Inc. v. Royal Globe Ins. Co.*, 99 Wn.2d 65, 69, 659 P.2d 509 (1983), *modified on reconsideration*, 101 Wn.2d 830, 683 P.2d 186 (1984). Further, language should be interpreted as an average purchaser of insurance would understand it. *Shotwell*, 91 Wn.2d at 168.

Accordingly, untried issues of fact exist as to the nature and scope of policy coverage for unexempted off-record defects. On remand, the trial court must examine the circumstances of the contract formation, together with the subsequent conduct of the parties, to determine the unexpressed intent of the parties with regard to the extent of coverage. The impact of two deleted exemptions is particularly relevant: (1) the exemption for encroachments and matters of location, boundary, and area that would be revealed by an accurate survey, and (2) the exemption for any defects or invalidity of an unrecorded leasehold interest absent the insurer's examination of the unrecorded lease. Denny's may then argue its contention that the situation at hand is covered by the policy terms.

## MARKETABILITY OF TITLE

Denny's alternatively maintains the extension of Denny's parking stalls onto the adjoining property renders Denny's title to the narrow lot with the restaurant building unmarketable, relying on dicta in *Transamerica*.[18] Under the policy terms, Security Union has contracted to insure against unmarketable title. The Washington Supreme Court has defined marketable title as a title "free from reasonable doubt

---

[18]"If Northwest desired to insure against the risk that improvements on its land encroached onto surrounding property, it could have requested such coverage.[3]"

Footnote 3 provides: "We note that such a provision may arguably have existed in Northwest's policy. Encroachment of property onto adjacent land may render the encroaching property unmarketable, a risk expressly covered by Northwest's title insurance policy. Because the parties failed to raise this issue, we decline to consider it in deciding this case." (Citations omitted.) *Transamerica*, 54 Wn. App. at 294.

and such as reasonably well informed and intelligent purchasers, exercising ordinary business caution, would be willing to accept." *Hebb v. Severson*, 32 Wn.2d 159, 166, 201 P.2d 156 (1948). A title is marketable if a purchaser may obtain a title that allows him

> not only to hold his land, but to hold it in peace; and if he wishes to sell it, to be reasonably sure that no flaw or doubt will come up to disturb its marketable value.

*Hebb v. Severson*, 32 Wn.2d at 166-67 (quoting *Empey v. Northwestern & Pacific Hypotheekbank*, 129 Wash. 392, 225 P. 226 (1924)).

Upon remand, Denny's may try the marketability issue. We observe, however, that, although resale value is almost always detrimentally affected by unmarketability, it does not necessarily follow that, when the resale value of property drops because of the physical condition of the land, the land is unmarketable. In other words, a distinction exists between marketability and merchantability.[19] Under some circumstances, encroachments onto adjoining land may affect the marketability of title. *Brown v. Herman*, 75 Wn.2d 816, 823-24, 454 P.2d 212 (1969) (finding sidewalks encroaching 5 feet onto public way were not encroachments that would render title unmarketable because of longstanding permission to allow the encroachment and unlikelihood of future removal). Whether the parking lot improvements were nonpermissive encroachments that would affect marketable title is a question of fact to be determined at trial.

## MUTUAL MISTAKE

Denny's also assigns error to the trial court's denial of its motion to amend its complaint to allege mutual mistake. Denny's seeks reformation of the insurance policy, contending the legal description used in the policy did not reflect the parties' intent to insure the restaurant as an integrated site with adjoining parking and signage. Under CR 9, an aver-

---

[19]*See Lick Mill Creek Apartments v. Chicago Title Ins. Co.*, 231 Cal. App. 3d 1654, 1660-61, 283 Cal. Rptr. 231, 234-35 (1991); *Hocking v. Title Ins. & Trust Co.*, 37 Cal. 2d 644, 234 P.2d 625 (1951).

ment of mistake must be specially pleaded and the circumstances stated with particularity. The particularity requirement must be met in the complaint itself and not in additional briefing. *Haberman v. WPPSS*, 109 Wn.2d 107, 165, 744 P.2d 1032, 750 P.2d 254, *appeal dismissed*, 488 U.S. 805 (1988). Denny's original complaint did not state a claim for mutual mistake and did not allege the original intention of the parties or the variance of that intent from the policy as issued.

██ ██ Under CR 15(a), the court may in its discretion allow a party to amend a complaint when justice requires. If the party moves to amend after summary judgment has been granted, the trial court may consider the merit or futility of the amended claim. *Doyle v. Planned Parenthood of Seattle-King Cy., Inc.*, 31 Wn. App. 126, 639 P.2d 240 (1982). The trial court's decision will be upheld absent an abuse of discretion. *Lincoln v. Transamerica Inv. Corp.*, 89 Wn.2d 571, 577, 573 P.2d 1316 (1978). The trial court denied Denny's claim based upon *Doyle v. Planned Parenthood of Seattle-King Cy., Inc.*, *supra*, apparently finding the mutual mistake claim had no merit. We find, however, that the mutual mistake claim is not without merit and raises issues of fact as to the parties' intent. Mutual mistake will support the reformation of a contract if both parties had identical intentions as to a term, and the writing materially varies from that intent. *Tumwater State Bank v. Commonwealth Land Title Ins. Co.*, 51 Wn. App. 166, 752 P.2d 930 (1988); *Akers v. Sinclair*, 37 Wn.2d 693, 703, 226 P.2d 225 (1950). The mistake must be proved by clear, cogent and convincing evidence, and if doubts exist as to the parties' intent, reformation is not appropriate. *Akers*, 37 Wn.2d at 703. A party assumes the risk of mistake if, at the time of contracting, the party is cognizant of its limited knowledge regarding the subject matter of the mistake but treats that knowledge as sufficient. *PUD 1 v. WPPSS*, 104 Wn.2d 353, 362, 705 P.2d 1195, 713 P.2d 1109 (1985).

Denny's argues that its complaint should have been amended because evidence of mutual mistake only came to light during discovery after the complaint had been filed. Denny's discovered a Security Union inspection sheet and map indicating that on visual inspection, the insurance inspector established property lines according to the landscaping and fencing. On this basis, Denny's contends Security Union intended to insure land outside the legal description set forth in the extended coverage title policy. Security Union points out that even if it had intended to insure the additional property, it would have taken an exception to the City's lease terms. This argument assumes that Security Union made no mistake and intended to insure no more than the legal description set forth. Yet, as Security Union's own internal memoranda indicate, its common practice is to survey and inspect the site prior to issuing extended coverage. Here, Security Union did inspect the property without detecting the discrepancy in the legal description and issued a policy pursuant to the favorable inspection. The parties' alleged "mistake" was in thinking the legal description in the policy accurately described the restaurant site. Security Union's apparent satisfaction with the inspection results suggests that at that point it assumed the risk that the inspection was inaccurate.

In light of this evidence supporting the mutual mistake claim, the trial court abused its discretion by denying Denny's motion to amend its complaint.

Denny's additionally argues that under CR 15(b), the trial court erred by not amending its pleadings to allege mutual mistake. CR 15(b) allows amendments to conform to the evidence and issues tried by the express or implied consent of the parties. The record indicates that Denny's first raised the mutual mistake claim in its memorandum in opposition to motion for partial summary judgment, alleging that the parties' true intent was to insure the entire integrated site, including adjoining city property. Security Union responded to this allegation on the merits in its reply to plaintiff's

opposition to motion for partial summary judgment. Oral argument was heard on the issue, although Security Union did point out that the issue had not yet been pleaded. It appears from the record that this issue was essentially litigated before the trial court, and under CR 15(b), the trial court abused its discretion by not allowing an amendment.

Denny's lastly asserts that the trial court erred by dismissing its tort claims based upon the statute of limitations. Denny's alleges Security Union breached its duty to detect and disclose the discrepancy in title, a cause of action not yet developed in this jurisdiction. *See Transamerica Title Ins. Co. v. Johnson*, 103 Wn.2d 409, 693 P.2d 697 (1985). Denny's was unable to argue the merits of its claim because the trial court granted Security Union's motion for summary judgment based upon the expiration of the statute of limitation. On appeal, Denny's argues that this cause of action does not fall neatly into a tort or contract cause of action, and therefore, Denny's may use either the tort 3-year statute of limitations or the 6-year contract statute of limitations.[20] When a statute of limitations is argued for the first time on appeal, the statute not objected to in the court below becomes the law of the case. *Vigil v. Spokane Cy.*, 42 Wn. App. 796, 799, 714 P.2d 692 (1986). Security Union points out that the 3-year statute was not challenged by Denny's below, and therefore the 3-year statute controls the case because Denny's did not object to its application. The record shows that although Security Union mentioned the 6-year statute in its motion for summary judgment, Denny's based its arguments upon the 3-year statute and never mentioned

---

[20]Denny's also argues that the discovery rule should apply to the 6-year statute of limitations set forth in RCW 4.16.040. In support of this proposition, Denny's relies on two Washington cases, *Stuart v. Coldwell Banker Comm'l Group, Inc.*, 109 Wn.2d 406, 415, 745 P.2d 1284 (1987) and *Peters v. Simmons*, 87 Wn.2d 400, 404-05; 552 P.2d 1053 (1976). These cases are inapposite because neither addresses RCW 4.16.040; rather, they address a 3-year statute of limitations. The California case cited, *Hall v. San Jose Abstract & Title Ins. Co.*, 172 Cal. App. 2d 421, 429, 342 P.2d 362, 367 (1959), applied the discovery rule to a contract claim because it was an express provision of the codified statute of limitations; it was not a court-imposed doctrine.

the 6-year statute. Therefore, Denny's should not be able to now argue from the 6-year statute.

 Moreover, the 6-year statute is not applicable to a cause of action for an insurance company's negligence. Denny's contends that Security Union's duty "arises out of " the written agreement. The determination of the proper statute of limitations period applicable to an insurance claim is based upon (1) whether the claim stems from the insurance contract itself, and (2) whether the policy itself expressly displaces the applicable statute of limitations. *Rones v. Safeco Ins. Co. of Am.*, 119 Wn.2d 650, 655, 835 P.2d 1036 (1992); *Safeco Ins. Co. v. Barcom*, 112 Wn.2d 575, 579, 773 P.2d 56 (1989). The Washington Supreme Court has indicated that the nature of an action for breach of a duty to search and disclose title defects would be in tort. "Regardless of the label given the ultimate theory relied on, the suggested action sounds in tort." *Transamerica Title Ins. Co. v. Johnson*, 103 Wn.2d 409, 412, 693 P.2d 697 (1985). The liability does not stem from the contract terms of the insurance policy. Nor do any of the policy provisions provide for a specific limitations period for such a claim. Therefore, Denny's claim is subject to the 3-year tort statute of limitations set forth in RCW 4.16-.080.

The 3-year limitation period commences when the cause of action accrues, generally when the wrongful act takes place. An exception to this general rule is sometimes observed when plaintiffs cannot know they have been injured. *In re Estates of Hibbard*, 118 Wn.2d 737, 744, 826 P.2d 690 (1992). In such cases, the discovery rule will toll the statute, and the cause of action accrues "when a claimant knows, or in the exercise of due diligence should have known, all the essential elements of the cause of action, specifically duty, breach, causation and damages." (Footnotes omitted.) *Hibbard*, 118 Wn.2d at 752. Actual harm is an essential element for a negligence action. *Gazija v. Nicholas Jerns Co.*, 86 Wn.2d 215, 219, 543 P.2d 338 (1975). Denny's urges that the discovery rule should apply in this case, relying on *Gazija v. Nicholas Jerns Co.*, *supra*. *Gazija* applied the discovery rule in a

case where the insurance company negligently canceled the policy of its insured, basing this extension of the rule partially on the fiduciary relationship existing between insured and insurance agent. The decision to extend the discovery rule to a cause of action is essentially a matter of judicial policy. *Gazija*, 86 Wn.2d at 221. As in *Gazija*, a fiduciary relationship existed between Denny's and Security Union that would justify application of the discovery rule.

Assuming arguendo that the discovery rule applies, Denny's must prove that the discovery of its claim occurred within 3 years of filing suit. Denny's claims that it did not suffer damages until Security Union denied its claim in 1988, when Denny's was consequently forced to defend against the City's ejectment suit. However, this injury does not proximately follow from Security Union's original failure to discover and disclose the discrepancy in the legal description. Rather, it stems from Security Union's separate and subsequent act in not extending coverage. The injury proximately resulting from the failure to disclose the title defect is Denny's reliance on the title report and its subsequent purchase of a leasehold estate that was worth less than the consideration paid. Denny's discovered in 1986 that the City owned the property under its parking lot and at that time had knowledge of all elements of its cause of action, including its injury. Because Denny's claim was not filed until April 27, 1990, it is barred by the 3-year statute of limitations that began to run in 1986 when Denny's cause of action accrued. The trial court did not err by granting summary judgment on that issue.

We affirm the trial court's dismissal of Denny's tort claim for negligence in failing to search for and disclose the discrepancy in legal descriptions. We reverse the trial court's dismissal of Denny's contract claims and remand for proceedings consistent with this opinion.

PEKELIS, A.C.J., and AGID, J., concur.